669 N.E.2d 347 (1996)
282 Ill. App.3d 665
218 Ill.Dec. 404
In the Interest of B.R., S.F., & C.W., Jr., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Shenita Brown & Fred Forest, Respondents-Appellants).
Nos. 3-95-0751, 3-95-0752.
Appellate Court of Illinois, Third District.
July 26, 1996.
*349 Lawrence M. Solomon, Peoria, for Fred Forest.
Philip M. Pollock, Peoria, for appellants.
John X. Breslin Deputy Director, State's Attorneys Appellate Prosecutor, Ottawa, Kevin W. Lyons, State's Attorney, Peoria, Gary F. Gnidovec, States' Attorneys Appellate Prosecutor, Ottawa, for S.F. and People. Susan K. Lucas, Peoria, Guardian Ad Litem.
Justice MICHELA delivered the opinion of the court:
The trial court found the respondents, Shenita Brown and Fred Forest, to be unfit parents. Thereafter, the court terminated their parental rights. Both respondents appealed and this court consolidated the appeals. We affirm the trial court's decisions regarding both respondents.

FACTS
The record shows that on January 13, 1995, the State filed a petition alleging that B.R. was an abused minor and that S.F. and C.W., Jr., (hereafter C.W.) were neglected minors due to severe injuries received by B.R. Respondent Forest is the father of S.F. The fathers of B.R. and C.W. were not involved in these proceedings. At the time the petition was filed, C.W. was 3 years old, B.R. was 14 months old, and S.F. was 2 months old. All three children were placed in shelter care.
On February 16, 1995, the State filed a supplemental petition to terminate the respondents' parental rights. The State alleged that both respondents were unfit for the following reasons: (1) depravity (750 ILCS 50/1(D)(i) (West 1992)); (2) extreme or repeated cruelty (750 ILCS 50/1(D)(e) (West 1992)); and (3) failure to protect the minors from conditions in their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 1992)).
At the fitness hearing, Dr. Robert Cruse, a pediatric neurologist, testified that he examined B.R. in the intensive care unit of St. Francis Hospital in Peoria on January 11, 1995. He described B.R. as stuporous and essentially in a coma. B.R. had hemorrhages in the retinas of both eyes, a condition which is consistent with a rapid acceleration/deceleration injury. He diagnosed B.R. as a victim of shaken baby syndrome. He further stated that B.R. was admitted with cardiac arrest which may have been caused by the brain injury. Cruse concluded that B.R. will remain severely impaired and will not be able to function normally or independently in the future.
Dr. Charles McCart, an emergency medicine physician, testified that he examined B.R. in the pediatric intensive care unit about 12 hours after his admittance. In his opinion, the bruising over B.R.'s body was consistent with at least two episodes of blunt trauma separated by at least one or two days. He noted that the bruising was very extensive and covered a large portion of his body. Furthermore, the number of bruises and their placement indicated that they were not consistent with normal activities of a child his age.
Peoria police officer Orlando Allen testified that he had a conversation with Brown on January 13, 1995. Brown told him that on January 10, 1995, she left her children with a neighbor so she could go on a job interview. On that day, the only bruise she had seen on B.R. was a small mark on his forehead. She told Forest that when he was ready, he should pick up the children from the neighbor's house. She was later notified that B.R. was in the hospital. At the hospital, Forest told Brown that he brought the children *350 home, put B.R. down on the floor, and was putting the other children to bed when he heard a "klunk." When he reached him, B.R. had stopped breathing. Brown told Allen that when she saw B.R.'s face she asked Forest how he got all the bruises. Forest replied that when B.R. stopped breathing, he slapped him a few times. Allen asked Brown if Forest ever physically disciplined the children, and she said that he did not. However, Brown told Allen about an incident where Forest "whipped" C.W. in the head with a chrome belt buckle.
Allen interviewed Brown again three days later. This time, she told Allen that the day before B.R. was shaken, she came home and noticed that B.R. had a bruise on his forehead. Forest told her that it happened when B.R. fell from the toilet during toilet training. When Brown questioned Forest more closely, however, he yelled at her and she did not pursue the issue. Brown then admitted that she thought Forest had shaken B.R.
Allen also testified that he spoke with Forest on January 13, 1995. His version of how the incident occurred was substantially similar to what Brown said Forest told her at the hospital. Forest also specifically denied ever physically disciplining the children.
Peoria police officer David Zachman testified that on July 4, 1994, he responded to a call from Brown about Forest. Brown told Zachman that she and Forest had argued over money while she was holding B.R. Forest punched her twice in the face and hit B.R. in the head. At that time, Brown was 4½ months pregnant and B.R. was seven months old.
Vicki Banks, a Department of Children and Family Services investigator, testified that she spoke to Brown on January 11, 1995. Brown told her that she had no idea where the bruises on B.R.'s body had come from. She said the only bruise that she was aware of was a small one on his forehead that he sustained when he fell and hit the toilet. Banks also spoke to C.W. that day. C.W. told her that he did not get spanked very often but that B.R. did. C.W. also said that "daddy" is mean to B.R. and he hits B.R. "upside the head." When Banks asked who daddy was, C.W. said daddy's name was Fred.
Veronica Brown, Shenita Brown's sister, testified that she spent a lot of time with the children and did not see any bruises on B.R. before he was shaken. She also testified that she had never seen Brown or Forest physically discipline any of the children.
The trial court found that the State had proven that Brown was unfit in that she failed to protect her children from an environment injurious to their welfare. 750 ILCS 50/1(D)(g) (West 1992). The court also found Forest unfit on all three grounds alleged in the petition. See 750 ILCS 50/1(D)(e), (g), (i) (West 1992).
At the best interests hearing, Forest did not appear. The court received a written report prepared by Colleen Ryan, a Lutheran Social Services caseworker. The report indicated that C.W. and S.F. were developing normally and doing well in foster care. B.R., however, was developmentally delayed and functioning at a low level. At the time the report was filed, B.R. could move his legs but not walk. Ryan indicated in the report that the foster mother of C.W. and B.R. is interested in adopting all three children.
In the report, Ryan indicated that from February 17 through February 24, 1995, Brown was a voluntary inpatient at Zeller Mental Health Center due to suicidal thoughts. On April 3, 1995, Brown told Ryan that she and Forest did not see each other any more. She said that she recently chased Forest with a butcher knife until the police came and told her to put the knife down. Brown also told Ryan that in the past two years Forest had pushed her head into a window and pushed her into a stove. Both Brown and Forest were referred for domestic violence counseling but had not consistently attended the sessions.
The report also contained a psychological evaluation of Brown performed by T.W. Matthews & Associates. Matthews reported that Brown has poor judgment with regard to decisions affecting her own well-being. Matthews also believed that Brown's capacity to manage her own affairs was questionable.
*351 Ryan then testified that Brown had consistently visited the children. She said that Forest did not establish paternity, even though she explained to him the importance of doing so. Further, although she told Forest to keep her informed of any address changes, he had not and she did not know how to locate him. He missed four appointments to take a psychological exam and had not taken the examination when Ryan filed her report.
Brown testified that she was living with B.R.'s father and his mother. She said she attended a couple of domestic violence lessons but then stopped because she did not think that she needed it. She explained that her emotional problems were related to the possible loss of her children. She said that when she and Forest were together, he participated in raising her children and she had never seen him mistreat them.
The court found it in the best interests of the children to terminate the respondents' parental rights.

BROWN'S CLAIMS
On appeal, Brown first contends that the trial court's finding that she was unfit for failing to protect her children from an environment injurious to their welfare was against the manifest weight of the evidence. See 750 ILCS 50/1(D)(g) (West 1992). Specifically, she argues that there was only a one or two day warning period before B.R. suffered from shaken baby syndrome and during that time Forest primarily cared for him.
A trial court's finding of parental unfitness must be based on evidence that is clear and convincing. In re Adoption of Syck, 138 Ill.2d 255, 149 Ill.Dec. 710, 562 N.E.2d 174 (1990). Once such a finding has been made, it is entitled to great deference. Therefore, on review the trial court's finding should be affirmed unless it is contrary to the manifest weight of the evidence. In re J.B., 198 Ill.App.3d 495, 144 Ill.Dec. 679, 555 N.E.2d 1198 (1990).
Here, the record reflects that Brown had more forewarning about Forest's violent tendencies toward herself and her children than she claims. Six months before B.R.'s injury, when Brown was 4½ months pregnant with S.F., she told Officer Zachman that Forest punched her twice in the face while she was holding seven-month-old B.R. She also told Zachman that Forest hit B.R. in the head. Brown told Detective Allen that Forest had previously "whipped" C.W. in the head with a chrome belt buckle. Further, Brown admitted that she did see a bruise on B.R.'s forehead the day before the incident, but she did not pursue the issue after Forest yelled at her when she asked how B.R. had sustained the bruise. Consequently, we find that the trial court's decision to find Brown unfit for failing to protect the minors from conditions within their environment was not against the manifest weight of the evidence.
Brown also argues that although the evidence may have been sufficient to find the children abused and neglected, it did not prove her unfit since the trial court did not allow her a period of time to correct the problem. We disagree. Section 1(D) of the Adoption Act lists the statutory grounds which will support a finding of unfitness, not a list of parental rights. Section 1(D)(g) does not entitle a parent to a specific period of time before a trial court may find a parent unfit on this ground. See In re M.M., 261 Ill.App.3d 71, 199 Ill.Dec. 436, 634 N.E.2d 36 (1994).
Brown also appeals the trial court's finding that it was in the minors' best interest to terminate her parental rights.
Once a finding of unfitness has been made, all considerations must yield to the best interests of the children. In re M.C., 197 Ill.App.3d 802, 144 Ill.Dec. 214, 555 N.E.2d 111 (1990). In parental termination proceedings, the standard of review is whether the trial court's best interest determination is contrary to the manifest weight of the evidence. In re I.D., 205 Ill.App.3d 543, 151 Ill.Dec. 94, 563 N.E.2d 1200 (1990).
Here, after the termination petition was filed, Brown chased Forest with a butcher knife until the police arrived and ordered her to put it down. She stayed with Forest even after she told Detective Allen that she thought he had caused B.R.'s injuries. During *352 this time, she had suicidal thoughts and was an inpatient at Zeller Mental Health Center. A psychological evaluation indicated that she has poor judgment with regard to decisions affecting her own well-being and her competency to manage her own affairs is questionable. In sum, the trial court's decision to terminate Brown's parental rights was not against the manifest weight of the evidence.

FOREST'S CLAIMS
Forest claims on appeal that the State failed to prove by clear and convincing evidence that he was an unfit person in that he subjected B.R. to extreme or repeated physical cruelty. 750 ILCS 50/1(D)(e) (West 1992). A finding of unfitness will not be disturbed on review unless it is against the manifest weight of the evidence. In re J.B., 198 Ill.App.3d 495, 144 Ill.Dec. 679, 555 N.E.2d 1198 (1990).
The record in this case supports the trial court's conclusion that the State met its burden of proving that Forest subjected B.R. to extreme or repeated physical cruelty. Forest shook B.R. severely enough to cause retinal hemorrhages in both eyes, brain damage, and cardiac arrest. Six months before that incident, he struck B.R. in the head when he was only seven months old. Further, Banks testified that C.W. told her that Forest is mean to B.R. and "hits him upside the head." This evidence amply demonstrates that the trial court's finding of extreme or repeated physical cruelty was not against the manifest weight of the evidence.
A finding of parental unfitness on any one ground obviates the need to review other statutory grounds alleged by the State. In re J.A.S., 255 Ill.App.3d 822, 194 Ill.Dec. 433, 627 N.E.2d 770 (1994). Therefore, we find that Forest's remaining contentions concerning the other grounds of unfitness (See 750 ILCS 50/1(D)(g), (i) (West 1992)) are moot. However, we note in passing that from our review of the record, there appears to have been sufficient evidence to support the trial court's findings on these grounds as well.
Finally, Forest argues that the trial court erred in finding that it was in S.F.'s best interest to terminate his parental rights since: (1) there was no lapse in time between the unfitness hearing and the best interest hearing where he could demonstrate to the court that he had been rehabilitated; and (2) the ruling was against the manifest weight of the evidence.
We initially note that Forest was not entitled to a waiting period between the unfitness and best interest hearings. Although a separate hearing and determination of the child's best interests is mandatory, the best interest hearing may be held immediately after the fitness hearing. In re A.P., 277 Ill.App.3d 593, 214 Ill.Dec. 299, 660 N.E.2d 1006 (1996).
We also find that the trial court properly terminated Forest's parental rights to S.F. At the best interest hearing, Ryan testified that Brown told her that Forest had pushed her head into a window and a stove on two separate occasions. Further, Forest did not attend the domestic violence counseling to which he had been referred. He missed four appointments which were made for him to have a psychological evaluation. He had not established paternity of S.F., although Ryan had explained the importance of doing so. At the time of the best interest hearing, Ryan did not even know how to contact him although she had asked him to inform her of any address changes. Finally, B.R. and C.W.'s foster mother testified that she was interested in adopting S.F. In sum, the evidence overwhelmingly favored a termination of Forest's parental rights.
Accordingly, the judgment of the circuit court of Peoria County is affirmed.
Affirmed.
HOLDRIDGE, P.J., and LYTTON, J., concur.