766 N.E.2d 1105 (2002)
199 Ill.2d 198
262 Ill.Dec. 802
In re C.W. et al., Minors (The People of the State of Illinois, Appellee,
v.
Rosanna W., Appellant).
No. 90738.
Supreme Court of Illinois.
March 21, 2002.
*1107 Rita A. Fry, Public Defender, Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.
James E. Ryan, Attorney General, Springfield, Richard A. Devine, State's Attorney, Chicago (William L. Browers, Assistant Attorney General, Chicago, Renee Goldfarb, Kenneth T. McCurry and Nancy Grauer Kisicki, Assistant State's Attorneys, of counsel), for the People.
*1108 Patrick T. Murphy, Charles P. Golbert, Anne Lipnitz, Allison I. Ortheb, Office of the Cook County Public Guardian, Chicago, for minors.
Justice FITZGERALD delivered the opinion of the court:
Following an evidentiary hearing, the circuit court of Cook County found that respondent, Rosanna W., was an unfit parent under section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 1998)), because she failed to protect her daughter, C.W., and her son, D.D., from conditions in their environment injurious to their welfare. The circuit court subsequently terminated respondent's parental rights to C.W. and D.D., and respondent appealed. The appellate court affirmed the judgment of the circuit court. No. 1-99-1843 (unpublished order under Supreme Court Rule 23). We granted respondent's petition for leave to appeal. See 177 Ill.2d R. 315. For the reasons set forth below, we affirm.

BACKGROUND
On April 30, 1996, the Department of Children and Family Services (DCFS) took protective custody of C.W. (born July 17, 1985) and her half-brother, D.D. (born July 26, 1991).[1] DCFS took protective custody after it received a hotline call from Carol Olsen, a social worker at C.W.'s school. Olsen had observed bruises on the inside of C.W.'s legs, a possible burn mark on her leg, and fresh bruises on both arms.
On May 2, 1996, the State filed petitions for adjudication of wardship (see 705 ILCS 405/2-13 (West 1996)), alleging that the minors were neglected in that their environment was injurious to their welfare (see 705 ILCS 405/2-3(1)(b) (West 1996)), and that the minors had been abused (see 705 ILCS 405/2-3(2)(i), (2)(ii) (West 1996)). At the hearing on the State's petitions, the parties stipulated that Olsen would testify regarding her observations of the bruises on C.W. The parties further stipulated that Olsen would testify that the bruises did not occur at C.W.'s school. The trial court found that C.W. was abused in that excessive corporal punishment was administered by an unknown parent, guardian or legal custodian (see 705 ILCS 405/2-3(2)(v) (West 1996)), and that D.D. was neglected in that his environment was injurious to his welfare (see 705 ILCS 405/2-3(1)(b) (West 1996)). At the subsequent dispositional hearing held on January 14, 1997, the trial court adjudged C.W. and D.D. wards of the court and placed guardianship in DCFS. See 705 ILCS 405/2-22, 2-27 (West 1996).
On May 20, 1998, approximately two years after C.W. and D.D. were taken into protective custody, the State filed, as to each minor, a petition for appointment of a guardian with right to consent to adoption (see 705 ILCS 405/2-29 (West 1998)), commonly referred to as a petition to terminate parental rights. The State alleged, in relevant part, that respondent was unfit in that she failed to protect the children from conditions in their environment injurious to their welfare (see 750 ILCS 50/1(D)(g) (West 1998)), and failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children and/or failed to make reasonable progress toward their return within nine months after the adjudication of neglect or abuse (see 750 ILCS 50/1(D)(m) (West 1998)).
In April 1999, the court conducted an evidentiary hearing on the State's petitions to terminate parental rights. Testimony *1109 and documentary evidence introduced at the fitness portion of the hearing revealed that C.W. had been hospitalized once in 1992, and twice in 1994, with elevated levels of lead in her system. Between 1992 and 1994, she also underwent multiple surgeries to remove foreign bodies she had placed in her ear. C.W. was diagnosed with pervasive developmental disorder (autism) and moderate mental retardation, and was described as trainably mentally handicapped. Beginning in 1992, C.W. attended a school for exceptional children. Mary Gilmore, C.W.'s teacher for four years beginning with the 1993-94 school year, testified that C.W. was frequently absent. Gilmore noticed that C.W.'s clothes were sometimes dirty, and that she sometimes smelled of urine, requiring Gilmore to bathe C.W. at the school once or twice per week. In April 1996, Gilmore noticed bruises and marks on C.W.'s legs and arms and spoke with Carol Olsen, the school social worker. Olsen examined C.W., but C.W.'s mental handicap prevented Olsen from discussing the bruises with her. Olsen placed a call to the DCFS hotline. This was the tenth hotline call received by DCFS over an eight-year period concerning respondent's children. At least five of these calls resulted in the issuance of "indicated reports,"[2] based on evidence of physical abuse, environmental neglect, inadequate shelter, or medical neglect.
Bridget Broadway, a DCFS investigator, first met C.W. and D.D. on April 30, 1996, five days after Olsen's hotline call was received by DCFS. Broadway attempted to interview C.W. at school, but C.W. was nonverbal. Broadway observed fresh bruises on C.W.'s legs and buttocks and evidence of old bruises. In response to Broadway's questions, D.D. indicated that he chased C.W. with sticks, and that he had been "whooped" by "Robert." Broadway also interviewed respondent, who offered different explanations for C.W.'s bruises. Respondent stated that the school was responsible, and that her other children had chased C.W. with a hanger.
Broadway immediately took C.W. and D.D. into protective custody. Although Broadway did not observe bruises on D.D. at that time, an examination by Dr. Poornima Narayen on the following day revealed old marks on his left buttocks, some linear marks on his back, one loop mark on his left thigh, and an old burn mark on his left hand. D.D. told Dr. Narayen that respondent "whooped" him with an extension cord. Following additional hospital evaluation, D.D. was diagnosed with lead poisoning and adjustment disorder with anxiety.
C.W. remained in a DCFS emergency shelter until July 1996, at which time she was placed in a foster home through a program at Uhlich Children's Home (Uhlich). D.D. was placed in a foster home in May 1996, and three months later, was placed in another foster home through the YMCA of Metropolitan Chicago (YMCA).
Kathy Grzelak, a caseworker at Uhlich, was assigned the case in July 1996. At that time, an initial client service plan, drafted in May 1996, was already in place. Under that plan, respondent was required to attend parenting classes and participate in counseling to address the issue of stress in child rearing. Respondent completed a parenting class in August 1996, and that same month, began counseling with Janet Dahm at the Adler School of Professional Psychology. In December 1996, Cynthia *1110 Michel, the primary caseworker for the family at the YMCA, rated respondent's progress under the initial service plan satisfactory.
Grzelak and Michel drafted the next client service plan in December 1996. Under this plan, respondent was required to continue with therapy, complete a bonding assessment, and engage in domestic violence counseling. Respondent completed the bonding assessment in February 1997. The psychologist who conducted the bonding assessment noted in his report that C.W. presented a "very demanding challenge" in light of her autism, and that D.D. could be a "very demanding child to work with," in light of indications that he may be suffering from ADHD (attention deficit hyperactivity disorder). The report also stated that providing parenting for respondent's children would present a "most difficult task for the best and most qualified and patient parent."
Michel testified that the decision to include domestic violence counseling in the December 1996 service plan was based on a number of factors: (1) respondent's varying explanations for a black eye she received over the 1996 Thanksgiving holiday; (2) respondent's complaint of a back injury at work, which Michel had reason to believe did not occur on the job; and (3) respondent's history of domestic violence, as reflected in the case file. Although respondent told caseworkers that she had been attending domestic violence counseling at Sarah's Inn since February 1997, when the referral was first made, it was later learned that respondent did not begin counseling until May 1997. Respondent had rescheduled visits with her children to accommodate counseling sessions that she was not attending. Respondent received an unsatisfactory rating under the December 1996 service plan.
The third client service plan was drafted in June 1997 and included Alvin, respondent's then live-in paramour. Respondent and Alvin began a relationship in 1994 or 1995, and began cohabiting in May 1996. Grzelak testified that the suspicion of domestic violence necessitated Alvin's participation in services if the children were to be returned to respondent. Grzelak's attempts to involve Alvin in services were unsuccessful. Records indicate, however, that he completed a parenting class in May 1998, just as Grzelak's involvement with the case ended. Grzelak testified that although respondent denied that Alvin was physically abusive, Grzelak became aware of a domestic battery allegation against Alvin, dating back to October 1997. Grzelak rated respondent's progress under the June 1997 service plan unsatisfactory, noting in her written report that respondent had not provided documentation to support her claim that she had followed through with recommended services.
During Michel's involvement with the case, which ended in August 1997, she observed visits between respondent, D.D. and B.W. At times, C.W. was also present. According to Michel, visits began well, but during the course of the hour, respondent's interaction with her children diminished and respondent would speak with Michel about events in respondent's life not pertinent to the children. Michel indicated that respondent was a loving parent, but not a capable parent. In the spring of 1997, based on Michel's own observations and the recommendation of respondent's counselor, Janet Dahm, Michel referred respondent for additional parenting classes. Records indicate that respondent successfully completed an eight-week parenting class approximately one year later in May 1998. This was the same class attended by Alvin.
*1111 During Grzelak's involvement with the case, she observed visits between respondent and C.W. Respondent was frequently late for the one-hour visits. During the visits, C.W. would seek out respondent's attention, and when it was not forthcoming, C.W. would act out. Respondent, in turn, would laugh, but would not redirect C.W. or try to comfort her. If respondent's other children were also present, C.W. received no attention from respondent. Respondent spent the time for visitation talking with any other adult that was present about matters unrelated to the children. Grzelak testified that there was no improvement in the visits she observed during the two-year period she was involved in the case. When Grzelak's involvement ceased in May 1998, Grzelak did not believe that respondent was in a position for return of her children. At that time, Grzelak recommended that visitation with C.W. be suspended based on reports from the foster mother that, following visitation, C.W. was irritable, sometimes scratched herself, and following the last visit in May 1998, had put paperclips on her wrists.
According to both Grzelak and Michel, respondent's support of her children was sporadic. With the exception of a single Christmas present for D.D. in 1996, and a birthday present for D.D. the following July, respondent did not send C.W. or D.D. clothes, gifts, cards, or letters.
The December 1997 client service plan generally required respondent to continue prior tasks, including attendance at parenting classes, visitation with her children, and participation in counseling to address issues related to the removal of her children, the history of domestic violence, and parenting skills. In June 1998, respondent received a satisfactory rating on the December 1997 plan. The report notes that, in addition to the parenting class completed by respondent and Alvin in May 1998, respondent also completed a 12-week class on domestic violence.
Respondent, who was called as an adverse witness by the assistant public guardian, testified regarding the volatile relationships she had with each of the fathers of her three children. Respondent testified that Vernon P., C.W.'s father, was verbally abusive, but she denied that he was physically abusive. In August 1990, several years after she separated from Vernon, respondent became involved with Darrell D., a drug user. Darrell is D.D.'s father. When respondent attempted to break off the relationship, Darrell made threatening telephone calls, flattened her tires, and generally harassed her. Respondent reported to psychologists that Darrell also hit her in the face. Respondent obtained four restraining orders against Darrell.
In late 1992, respondent became involved with Brian W., B.W.'s father. According to respondent, prior to B.W.'s birth in May 1993, Brian was verbally abusive. Shortly after B.W.'s birth, Brian became physically abusive. Respondent testified that Brian gave her two black eyes, broke three of her toes, beat her in the face, and put a gun to her head. After one beating, respondent was hospitalized. Respondent also testified that after the abuse began, she continued her relationship with Brian for over two years. In March 1996, respondent obtained a restraining order against Brian.
Respondent also testified that C.W., D.D. and B.W. had each witnessed one or more instances of abuse or harassment. During one occurrence in which Brian had pulled respondent into the playroom and locked the door, C.W. dialed 911.
According to Janet Dahm's January 9, 1998, disposition summary, respondent missed 26 of 60 potential therapy sessions *1112 between August 1996 and January 1998. Several sessions were missed reportedly due to various injuries and illnesses. Beginning in August 1996, respondent did not attend counseling for four weeks due to back pain related to an unspecified injury. In January 1997, respondent reported that she had sustained a broken rib while lifting a patient during the course of her employment as a home health-care aid. In October 1997, respondent cancelled a session due to weakness, dizziness and a persistent and severe headache that prompted an emergency room visit. In early December 1997, respondent reported for a session with a swollen and bruised left eye. Later that month, she missed a session due to pain in her shoulder, leg and abdomen, prompting another emergency room visit. Respondent consistently denied any abuse by Alvin. In her January 1998 report, Dahm stated that respondent made "somewhat limited progress toward treatment goals."
Respondent called one witness, Carrie Kennelly. Kennelly, who was respondent's therapist beginning in March 1998, testified that during the 13 months that she worked with respondent, respondent attended 40 sessions and missed 13 sessions. Issues addressed in counseling included parenting skills, particularly for special needs children; domestic violence; anger management; and issues related to the findings of abuse and neglect. According to Kennelly, respondent showed progress, and although her attendance had been intermittent, she demonstrated a vested interest in learning the skills necessary to parent C.W. and manage her own anger. In sessions with Kennelly, respondent consistently denied any domestic violence in her relationship with Alvin. She also consistently denied knowledge of the abuse that led to the children's removal.
On April 15, 1999, the trial court ruled that the State had not proved, by clear and convincing evidence, that respondent failed to make "reasonable efforts" or "reasonable progress" under section 1(D)(m) of the Adoption Act. See 750 ILCS 50/1(D)(m) (West 1998). The trial court found, however, that the State met its burden under section 1(D)(g), and found respondent unfit as to both C.W. and D.D., in that she failed to protect her children from conditions in their environment injurious to their welfare. See 750 ILCS 50/1(D)(g) (West 1998). The court explained to respondent that the injurious conditions in the children's environment concerned the series of abusive men that she failed to eliminate from her life.
At the "best interests" portion of the hearing (see 705 ILCS 405/2-29(2) (West 1998)), the trial court heard evidence of the volatile relationship between respondent and Alvin, including evidence of domestic disturbances in March 1998 and February 1999 in which police were summoned. The court also heard testimony from the current caseworkers, as well as C.W.'s foster parent. At the conclusion of the hearing, the trial court found that it was in the best interests of C.W. and D.D. that respondent's parental rights be terminated. The court stated that respondent had made a conscious choice to stay with people who physically abused her, and that respondent's children would not be safe in her custody.
The appellate court affirmed the judgment of the trial court. No. 1-99-1843 (unpublished order under Supreme Court Rule 23). This appeal followed.

ANALYSIS
Under the Juvenile Court Act of 1987, the involuntary termination of parental rights involves a two-step process. First, there must be a showing, based on *1113 clear and convincing evidence, that the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998)). If the court makes a finding of unfitness, the court then considers whether it is in the best interests of the child that parental rights be terminated. See 705 ILCS 405/2-29(2) (West 1998); In re Adoption of Syck, 138 Ill.2d 255, 276-78, 149 Ill.Dec. 710, 562 N.E.2d 174 (1990); see also In re C.N., 196 Ill.2d 181, 209, 256 Ill.Dec. 788, 752 N.E.2d 1030 (2001).
Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed "unfit," any one ground, properly proven, is sufficient to enter a finding of unfitness. See 750 ILCS 50/1(D) (West 1998) (providing that the "grounds of unfitness are any one or more of the following" enumerated grounds (emphasis added)). Section 1(D)(g), relevant to this appeal, provides that unfitness may be based on the "[f]ailure to protect the child from conditions within his environment injurious to the child's welfare." 750 ILCS 50/1(D)(g) (West 1998).
Respondent maintains that, as a matter of law, a parent may not be found unfit under section 1(D)(g) during a period of time that the children were not in a parent's legal custody or care and, in fact, were in foster care. Respondent also maintains that a parent may not be found unfit based on the same injurious environment and the same conduct that led to the initial removal of the children.
The State argues that respondent is improperly reading a limitation into section 1(D)(g) that does not exist. The State further argues that under respondent's reading of section 1(D)(g) the court is precluded from considering evidence of respondent's conduct occurring either before or after the removal of her children, thus rendering section 1(D)(g) meaningless.[3]
Before addressing these arguments, we consider the appropriate standard of review. Where a challenge is made to the sufficiency of the evidence underlying a trial court's finding of unfitness, a reviewing court will reverse such finding only where it is against the manifest weight of the evidence. Syck, 138 Ill.2d at 274, 149 Ill.Dec. 710, 562 N.E.2d 174. Respondent, however, does not challenge the sufficiency of the evidence in this case. Respondent instead raises purely legal issues regarding the proper construction of section 1(D)(g). We review issues of statutory construction de novo. C.N., 196 Ill.2d at 208, 256 Ill.Dec. 788, 752 N.E.2d 1030.
Our primary objective in construing a statute is to give effect to the intention of the legislature. Yang v. City of Chicago, 195 Ill.2d 96, 103, 253 Ill.Dec. 418, 745 N.E.2d 541 (2001). In pursuit of this objective, we turn first to the language of the statutethe most reliable indicator of the legislature's intent. Yang, 195 Ill.2d at 103, 253 Ill.Dec. 418, 745 N.E.2d 541; In re D.D., 196 Ill.2d 405, 419, 256 Ill.Dec. 870, 752 N.E.2d 1112 (2001). Where the statutory language is clear and unambiguous, there is no need to resort to other aids of construction. In such a case, a court must give effect to the statute as written, without reading into it exceptions, limitations, or conditions that the legislature did not express. In re D.L., 191 Ill.2d 1, 9, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000).
*1114 Under the clear and unambiguous language of section 1(D)(g), a finding of parental unfitness is only warranted where the evidence establishes that the parent failed to protect the child from conditions in the child's environment injurious to the child's welfare. It follows, therefore, that where a child has been removed from an injurious home environment and placed in foster care, a parent cannot be found unfit based on a "failure to protect" during the period the child is in foster care. See In re Massey, 35 Ill.App.3d 518, 521-22, 341 N.E.2d 405 (1976) ("Since the child has been in a foster home for the past 6 years, the parents could not have failed to protect it during this time"); see also In re J.D., 314 Ill.App.3d 1109, 1110, 248 Ill.Dec. 385, 734 N.E.2d 93 (2000) (where appellate court accepted State's concession that statutory ground of failure to protect from an injurious environment was not available as a basis for terminating parental rights because the children were in foster care for several years and the trial court, in its findings, referred to the period of time when the children were in DCFS custody).
The State argues, however, that a finding of unfitness under section 1(D)(g) may be based on evidence of injurious conditions in the parent's environment after the minor is removed and placed in foster care. The State explains that the parent's environment is highly relevant because that is the environment which, "but for the intervention of the State, the child would still be exposed." It is also the environment "to which the child potentially will be returned." The State's reading of the statute cannot be reconciled with its plain language.
Contrary to the State's argument, section 1(D)(g) makes no mention of the parent's environment following removal of the child. It also makes no mention of the environment to which a child "would still be exposed," absent state intervention, or the environment "to which the child potentially will be returned." Further, nothing in the language of section 1(D)(g) suggests that it was intended to address any circumstance other than a parent's actual failure to protect his or her child. Under the State's reading of section 1(D)(g), however, a parent could be found unfit based on speculation about the parent's future failure to protect. Similarly, nothing in section 1(D)(g) suggests that a parent may be found unfit based on a failure to correct or improve an injurious environment following removal of the minor. Yet, under the State's reading of section 1(D)(g), a parent also could be found unfit on that basis. Although the legislature could have provided multiple and alternative bases for a finding of unfitness under section 1(D)(g), it did not do so. Rather, the legislature provided a single ground of unfitness: "Failure to protect the child from conditions within his environment injurious to the child's welfare." 750 ILCS 50/1(D)(g) (West 1998). This court cannot, in the guise of statutory construction, expand this ground of unfitness beyond its plain language; we must give effect to the statute as written. See D.L., 191 Ill.2d at 9. 245 Ill.Dec. 256, 727 N.E.2d 990.
We do not imply that evidence of a parent's failure to correct or improve injurious conditions following removal of the child is irrelevant in determining unfitness. Section 1(D)(m) provides a separate ground of unfitness that specifically addresses a parent's failure "to make reasonable efforts to correct the conditions that were the basis for the removal of the child," and the failure "to make reasonable progress toward the return of the child." 750 ILCS 50/1(D)(m) (West 1998). "Reasonable progress" includes a parent's compliance with service plans and court directives, "in light of the condition which *1115 gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." C.N., 196 Ill.2d at 216-17, 256 Ill.Dec. 788, 752 N.E.2d 1030. Thus, evidence of injurious conditions which persist after removal of the child would be relevant to an unfitness finding under section 1(D)(m). It is irrelevant, however, to an unfitness finding under section 1(D)(g).
The State argues, nonetheless, that under this court's decision in D.L., evidence under section 1(D)(g) may include evidence of the parent's environment after removal of the child. In D.L. we considered whether a trial court was limited in the evidence it could consider in support of unfitness under section 1(D)(m). We observed that, in some of the grounds of unfitness set forth in section 1(D), the legislature specified an applicable time period, and that in other grounds the legislature did not do so. D.L., 191 Ill.2d at 10-11, 245 Ill.Dec. 256, 727 N.E.2d 990. This demonstrated the legislature's belief that, "for purposes of establishing certain allegations of unfitness, a parent's conduct during a specified period of time would be relevant." D.L., 191 Ill.2d at 11, 245 Ill.Dec. 256, 727 N.E.2d 990. The State argues that following the reasoning in D.L., the absence of a specific time period in section 1(D)(g) demonstrates that the legislature intended that there be no limitation on the evidence submitted under this section. We disagree.
At the time of the termination proceeding in D.L., section 1(D)(m) provided that a finding of unfitness may rest on the "[f]ailure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor * * *." (Emphasis added.) 750 ILCS 50/1(D)(m) (West 1994). We concluded that, under the plain language of section 1(D)(m), evidence of unfitness was limited to that 12-month period. D.L., 191 Ill.2d at 10, 245 Ill.Dec. 256, 727 N.E.2d 990. As already discussed, under the plain language of section 1(D)(g), evidence in support of this ground of unfitness must focus on the child's environment and the parent's failure to protect before removal of the child from the injurious home environment. Logic dictates that once the child is removed from the injurious environment, there can be no further failure to protect.
The appellate court, based on its review of the record in this case, concluded that the trial court had based its unfitness finding on evidence of respondent's conduct after the removal of C.W. and D.D. We disagree. During the fitness portion of the hearing, the State introduced some evidence regarding respondent's conduct and environment following the removal of her children, but introduced virtually no evidence regarding respondent's relationship with Alvin, her then-live-in paramour. Clearly, the caseworkers harbored a suspicion that Alvin, like respondent's prior paramours, was physically abusive, but evidence of such abuse was not introduced until the best-interests hearing. The only evidence of abusive relationships offered during the fitness portion of the hearing concerned respondent's relationship with the fathers of her three children. The trial court's finding of unfitness, therefore, could not have been based on evidence that respondent continued to live in an injurious environment after the removal of the children. Rather, as respondent maintains, the trial court's finding of unfitness was necessarily based on respondent's conduct before the removal of her children. Although this is precisely the kind of evidence *1116 a court must consider in making a determination under section 1(D)(g), respondent contends that, under the facts and circumstances of this case, such evidence cannot support the trial court's unfitness finding. Respondent directs our attention to the trial court's ruling rejecting the State's allegations that respondent failed to make reasonable efforts to correct the conditions that led to the removal of C.W. and D.D. and reasonable progress toward their return. See 750 ILCS 50/1(D)(m) (West 1998). According to respondent," if the law allows the trial court to find reasonable progress and then in the next breath allows the court to terminate parental rights based on injurious environment, which was a predicate for the removal of the minors in the first place, this would render meaningless the receipt of service[s] by any parent, and the successful completion of these services."
Initially, we note that, contrary to respondent's argument, the trial court did not terminate her parental rights "based on injurious environment." The trial court's finding that respondent had failed to protect C.W. and D.D. from an injurious environment merely allowed the State to proceed to the second stage of the bifurcated termination hearing, at which time the trial court heard evidence as to the children's best interests. See Syck, 138 Ill.2d at 276-78, 149 Ill.Dec. 710, 562 N.E.2d 174. Only after hearing additional testimony from respondent and other witnesses did the trial court conclude that it was in the best interests of the children that respondent's parental rights be terminated.
As to the substance of respondent's argument, we disagree that her allegedly successful completion of offered services precluded a finding of unfitness based on her conduct which led to the removal of her children. Although the provision of services to parents is an integral part of the statutory scheme (see C.N., 196 Ill.2d at 215-16, 256 Ill.Dec. 788, 752 N.E.2d 1030), there is no requirement under section 1(D)(g) that a parent be permitted a period of time to correct or improve an injurious environment before he or she may be found unfit on this ground. See In re B.R., 282 Ill.App.3d 665, 670, 218 Ill.Dec. 404, 669 N.E.2d 347 (1996) (rejecting parent's contention that she could not be found unfit under section 1(D)(g) because the trial court did not allow her a period of time to correct the problem); see also In re M.M., 261 Ill. App.3d 71, 72-73, 199 Ill.Dec. 436, 634 N.E.2d 36 (1994) (rejecting parents' contention that they could not be found unfit under section 1(D)(b) for failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, where they were not permitted time to make progress toward the children's return).
Additionally, evidence that a parent substantially completed offered services, or otherwise refrained from prior objectionable conduct following removal of the child, does not somehow absolve or erase the parent's initial failing that triggered State intervention and removal of the child. Rather, such evidence is appropriately considered at the second stage of the termination hearing, at which the court considers whether it is in the best interest of the minor that parental rights be terminated. At that time, the full range of the parent's conduct can be considered. See D.L., 191 Ill.2d at 12-13, 245 Ill.Dec. 256, 727 N.E.2d 990 (holding that where the parent was found unfit under section 1(D)(m), evidence of the parent's more recent conduct occurring outside the relevant statutory period may be introduced at the best interests hearing); In re Adoption of D.A., 222 Ill.App.3d 73, 79-80, 164 Ill.Dec. *1117 696, 583 N.E.2d 612 (1991) (holding that a parent's departure from a lengthy period of objectionable conduct does not eliminate the existence of grounds for determination that the parent is unfit; instead, it is a factor to consider at the best interests hearing).
Moreover, we note that the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness. D.L., 191 Ill.2d at 8, 245 Ill.Dec. 256, 727 N.E.2d 990. Although the State may rely on several grounds in its petition, a finding adverse to the parent on any one ground is sufficient to support a subsequent termination of parental rights. D.D., 196 Ill.2d at 422, 256 Ill.Dec. 870, 752 N.E.2d 1112. Here, the trial court found that the State had not proved, by clear and convincing evidence, that respondent failed to make "reasonable efforts" or "reasonable progress" under section 1(D)(m). See 750 ILCS 50/1(D)(m) (West 1998). An insufficiency in the evidence under section 1(D)(m) did not preclude the trial court from finding that there was sufficient evidence under the independent ground, also alleged by the State, set forth in section 1(D)(g).
We reject respondent's argument for the further reason that it effectively renders section 1(D)(g) a nullity. As discussed earlier in this opinion, respondent argued, and we agreed, that an unfitness finding for "failure to protect" under section 1(D)(g) cannot be based on a period of time during which the children were outside the injurious home environment and were in foster care. We thus concluded that evidence of the parent's conduct after the removal of the children is irrelevant to this ground of unfitness. Under respondent's present argument, evidence of a parent's conduct before the removal of the child is also irrelevant under section 1(D)(g). Such a construction effectively eliminates "failure to protect" as a ground of unfitness. Respondent maintains, however, that section 1(D)(g) would remain applicable to address instances where a parent, whose child is in foster care, fails to protect that child from an injurious environment during parental visitation. Respondent cites no reported case in which section 1(D)(g) has been applied in this manner.
Just as we would not expansively read section 1(D)(g) to provide for additional bases of unfitness not supported by the plain language of the statute, we will not restrictively read section 1(D)(g) so that, for all intents and purposes, it is meaningless. See In re Marriage of Lasky, 176 Ill.2d 75, 79, 223 Ill.Dec. 27, 678 N.E.2d 1035 (1997) ("courts construe statutory provisions in a manner that * * * gives full effect to each provision wherever reasonably possible"); People v. Singleton, 103 Ill.2d 339, 345, 82 Ill.Dec. 666, 469 N.E.2d 200 (1984) ("statutes should be construed so that language is not rendered meaningless or superfluous"); Maiter v. Chicago Board of Education, 82 Ill.2d 373, 388-89, 47 Ill.Dec. 721, 415 N.E.2d 1034 (1980) ("court will not assume that the legislature engaged in a meaningless act"). We therefore reject respondent's contention that unfitness under section 1(D)(g) cannot be based on evidence of the parent's conduct which gave rise to the removal of the children.
We note that decisions from our appellate court that have expressly considered whether a parent may be found unfit on the same ground that formed the basis for the neglect adjudication and the child's removal from the home are not in agreement on this issue. Compare In re L.N., 278 Ill.App.3d 46, 49, 214 Ill.Dec. 798, 662 N.E.2d 152 (1996) (holding that respondent's alleged failure to protect could form the basis for the initial removal of the child *1118 from the home, but was irrelevant in the subsequent termination proceeding when the child had been in foster care), with In re G.V., 292 Ill.App.3d 301, 307-08, 226 Ill.Dec. 303, 685 N.E.2d 406 (1997) (rejecting L.N., and holding that failure to protect a child from an injurious environment in support of the original neglect adjudication may also provide the basis for unfitness at a subsequent termination proceeding). The appellate court in the present case followed the reasoning in G.V. Based on our discussion above, we agree that G.V. presents the better reasoned view.
Our conclusion that a parent may be found unfit under section 1(D)(g) based on evidence of the parent's conduct which also led to the removal of the child does not, contrary to respondent's argument, "render meaningless the receipt of service[s] by any parent, and the successful completion of these services." A stated purpose of the Juvenile Court Act of 1987 is to "secure for each minor subject [t]hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal * * *." (Emphases added.) 705 ILCS 405/1-2(1) (West 1998). The State's Attorney and the court are bound to act in furtherance of this purpose. In re J.J., 142 Ill.2d 1, 8, 153 Ill.Dec. 239, 566 N.E.2d 1345 (1991). In this case, the State believed that, notwithstanding any technical compliance by respondent with the service plans, respondent had failed to correct conditions in the home following removal of her children. The State was not required to disregard respondent's initial and substantial failing as a parent merely because she participated in offered services.

CONCLUSION
As indicated earlier, respondent in the present case has not challenged the sufficiency of the evidence introduced by the State in support of the trial court's finding of unfitness, nor has respondent challenged the sufficiency of the evidence underlying the trial court's order terminating parental rights. Respondent has requested only that this court "correct erroneous legal rulings by the trial court and the [a]ppellate [c]ourt." Having rejected both legal arguments raised by respondent, we therefore affirm the judgment of the appellate court, affirming the judgment of the trial court terminating respondent's parental rights.
Affirmed.
NOTES
[1] A third child, B.W. (born May 26, 1993), was also taken into custody. This appeal concerns respondent's parental rights only as to C.W. and D.D.
[2] Under the Abused and Neglected Child Reporting Act, if an investigation determines that credible evidence of the alleged abuse or neglect exists, an "indicated report" is made. 325 ILCS 5/3 (West 1998).
[3] The public guardian of Cook County, who has filed a brief on behalf of C.W. and D.D., makes essentially the same arguments.