NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250393-U

NOS. 4-25-0393, 4-25-0394 cons.

IN THE APPELLATE COURT

FILED
September 24, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* E.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 23JA171 |
| v.        (No. 4-25-0393) | ) | |
| Ashley R. | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 24JA48 |
| *In re* X.O., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.        (No. 4-25-0394) | ) | Honorable |
| Ashley R., | ) | Karen S. Tharp, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:     The appellate court affirmed, finding the trial court's determination that respondent mother was unfit and that it was in her children's best interests to terminate her parental rights was not against the manifest weight of the evidence.

¶ 2     Respondent, Ashley R., appeals the trial court's termination of her parental rights with respect to her children, E.R. (born in 2021) and X.O. (born in 2024). She contends that the court's determination that she was unfit and that it was her children's best interests to terminate her parental rights was against the manifest weight of the evidence.

¶ 3     We disagree and, for the following reasons, affirm.

¶ 4                                    I. BACKGROUND

¶ 5         On August 25, 2023, the State filed a petition seeking to make respondent's minor child, E.R., a ward of the court. The petition alleged that E.R. was at risk of physical abuse and excessive corporal punishment due to her sibling being abused by her father, Randy R., and respondent (see 705 ILCS 405/2-3(2) (West 2022)). Both respondent and Randy had been arrested the day prior to the filing of the petition and charged with aggravated battery to a child. Following a shelter care hearing, E.R. was placed into the temporary custody of the Illinois Department of Children and Family Services (DCFS). DCFS later suspended all visits between E.R. and her parents based on the nature of the allegations against them.

¶ 6         On December 20, 2023, the trial court adjudicated E.R. abused after respondent stipulated to the allegation in the State's petition that Randy inflicted excessive corporal punishment on E.R.'s sibling by banging the minor's head and making the minor stand in her own feces and urine for prolonged periods of time while in the presence of respondent. At a dispositional hearing on January 17, 2024, the court found respondent and Randy to be unfit, unable, or unwilling, for reasons other than financial circumstances alone, to care for, protect, train educate, supervise, or discipline E.R. The court found it was in E.R.'s best interests to make her a ward of the court. Custody was continued with DCFS, and the court admonished the parents that they must cooperate with DCFS, comply with the terms of their service plans, and correct the conditions that required E.R. to be in care or risk termination of their parental rights.

¶ 7         On March 19, 2024, the State filed a second petition for adjudication of wardship, alleging that the infant X.O., who was born to respondent while she was incarcerated, was also an abused or neglected minor. The petition alleged, in part, that X.O.'s environment was injurious to his welfare, as evidenced by his siblings being adjudicated abused and neither respondent nor

Randy making reasonable progress toward having them returned to their care (see 705 ILCS 405/2-3(1)(b) (West 2024)). X.O. was placed into shelter care and temporary custody was given to DCFS. He was later adjudicated neglected and made a ward of the court.

¶ 8 On November 15, 2024, the State filed motions to terminate both parents' rights to both children. With respect to E.R., the State alleged, in relevant part, that respondent was unfit because she (1) had failed to maintain a reasonable degree of interest, concern, or responsibility as to E.R.'s welfare (750 ILCS 50/1(D)(b) (West 2024)), (2) had demonstrated extreme or repeated cruelty to the child (*id.* § 1(D)(e)), (3) was depraved, as evidenced by her convictions for aggravated battery to a child and aggravated battery/great bodily harm/torture (*id.* § 1(D)(i)), (4) had failed to make reasonable efforts to correct the conditions which were the basis for E.R.'s removal within nine months following an adjudication of neglect (specifically, the period from December 20, 2023, to September 20, 2024) (*id.* § 1(D)(m)(i)), and (5) had failed to make reasonable progress toward the return of the minor within the same nine month period (*id.* § 1(D)(m)(ii)). With respect to X.O., the State alleged, in relevant part, that respondent was unfit because she (1) had failed to maintain a reasonable degree of interest, concern, or responsibility as to X.O.'s welfare (*id.* § 1(D)(b)), (2) had demonstrated extreme or repeated cruelty to the child's sibling (*id.* § 1(D)(e)), (3) was depraved, as evidenced by her convictions (*id.* § 1(D)(i)), and (4) was incarcerated as the result of a criminal conviction and, prior to her incarceration, she had little or no contact with X.O. or provided little or no support for him, and her incarceration would prevent her from discharging her parental responsibilities for more than two years after the filing of the petition (*id.* § 1(D)(r)).

¶ 9 On April 17, 2025, Randy signed a final and irrevocable surrender of his parental rights for each child. The same day, a hearing was held on the State's motion with respect to

respondent.

¶ 10  The State's first witness, Daniel Porter, testified he was employed with DCFS and had been assigned to work on the minors' cases from when they first began, from September 2023 until June 2024. He stated that the case opened in late August 2023 due to allegations of abuse and neglect in the parents' home. An integrated assessment that was performed on respondent was entered into evidence. The assessment stated:

> "[T]here are concerns that any services would not be able to resolve safety risks associated with the reason the family came to the attention of the DCFS. However, should the Child and Family Team or the Courts decide to pursue reunification, [respondent] should be re-evaluated after the legal concerns against her are resolved, and she can freely participate in assessments and services. The concerns that brought the family to the attention of DCFS also suggests that if the Child and Family Team or Court decides to reunify [respondent] and her children, long-term close monitoring of her parenting and the health and well-being of her child would need to be in place until the child turns the age of 18."

¶ 11  Porter testified that he created two service plans for respondent, both of which were entered into evidence. Under the service plans, respondent was required to cooperate with DCFS, maintain housing and income, complete parenting classes and parenting coaching, undergo a mental health assessment and abide by any recommendations, and complete domestic violence victim services. Porter stated that respondent did not complete any services because, at the time, she was housed in the Sangamon County jail and so was unable to be referred for them. She also had no visits with her children because DCFS suspended visitation. Porter confirmed that respondent had since been convicted for the allegations of abuse that brought her children into

care. The State entered a certified copy of the 14 criminal charges that were filed against respondent, as well as a certified copy of the judgment and sentence, showing that respondent had pled guilty to one count of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2022)) and one count of aggravated battery to a child (*id.* § 12-3.05(b)(2)). For her convictions, she received nine-year sentences, to be served concurrently.

¶ 12      On cross-examination, Porter agreed that respondent was cooperative with DCFS and her service plan to the extent that she could be while incarcerated. However, he noted that even with her completion of services, due to the nature of the allegations against her, it was determined at the initial assessment that it was unlikely that the children would ever be returned home to her.

¶ 13      Jewel Waddy, the minors' current caseworker, testified that she made two service plans for respondent in August 2024. Under these plans, respondent was again required to obtain employment, cooperate with DCFS, complete parenting courses, and complete domestic violence services. Waddy stated that respondent completed programs for parenting and domestic violence, which were offered at the facility where she was. However, her overall progress remained unsatisfactory, and she was uninvolved in the minors' lives. Like Porter, Waddy testified that even if respondent had successfully completed all of her services, it was unlikely that she would get her children back.

¶ 14      Respondent testified that both she and her children were victims of Randy's abuse and she was afraid of him. She recounted that Randy controlled much of her life, including telling her to discipline the children. She stated she would do so because "when [she] didn't do what he wanted to[,] he would do it and it was 100 times worse." On questioning by the State, she denied that she was avoiding blame, stating, "My actions, as much as I didn't want to do any of it, I had

to. Otherwise, it was worse." She stated that she tried to leave Randy on multiple occasions.

¶ 15     With respect to E.R., the trial court found respondent unfit on multiple grounds. It concluded that respondent had failed to make reasonable progress or efforts during the alleged nine-month period, largely due to her incarceration. It also found that respondent's conviction for aggravated battery of a child created a rebuttable presumption that she was depraved, which respondent had failed to overcome. The court acknowledged the courses respondent took while incarcerated but noted that until respondent was released, there was no way to do parenting time between her and her children and therefore no way to assess whether respondent "just sat through the classes and just put in minimal effort." The court further found respondent had demonstrated extreme and repeated cruelty to E.R., noting that although respondent claimed Randy had threatened her, "as a mother, [she] had to take action."

¶ 16     With respect to X.O., the trial court declined to find that respondent demonstrated extreme or repeated cruelty, noting that the allegations of abuse concerned X.O.'s sibling, not X.O. himself, as required by statute. However, the court again found that the State had proven respondent was depraved and further found that it had proven respondent was unfit due to her incarceration and the fact that she had little to no contact with X.O. and her incarceration would prevent her from discharging her parental responsibility for more than two years. Finally, the court found that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to X.O.'s welfare.

¶ 17     Following the unfitness findings, the case proceeded immediately to a best-interests hearing. Jewel Waddy again testified, stating that she visited the minors once a month in the home where they were fostered together. Originally, E.R. was fostered with her maternal grandmother. However, she was moved when it was discovered that her grandmother was allowing video chats

between E.R. and respondent, contrary to DCFS's direction. Waddy testified that the minors were doing very well in their placement. E.R. had progressed from communicating in sign language to speaking full sentences. Both minors had a strong bond with their foster mother and each other, and their foster mother had signed forms indicating her commitment to adopting both children. Waddy testified that their foster home provided safety and permanence and their needs were being met. She stated her belief that it was in the best interests of both children to remain in the foster home.

¶ 18        Respondent testified that her desire was to have her children returned to her and, if that was not possible, to have them fostered by her mother.

¶ 19        The trial court first discussed an error in its prior unfitness finding. It noted that although it had found respondent was unfit on the grounds of repeated and extreme cruelty to E.R., the abuse on which that finding was based did not concern E.R., but E.R.'s sibling. Therefore, the court amended its order to remove its finding on that allegation. It reiterated that its findings of unfitness on the other grounds were unaffected.

¶ 20        The trial court found it was in the best interests of both children to terminate respondent's parental rights. It found that the children were loved and well cared for in their current placement. It specifically emphasized the need for permanency, stating that although respondent asked for more time to demonstrate her ability to parent her children, the children were entitled to security and "to know who's going to be there for them every day, day in and day out looking after their needs." Respondent's parental rights were terminated, and DCFS was granted the ability to consent to the adoption of the children.

¶ 21        This appeal followed.

¶ 22                                II. ANALYSIS

¶ 23 At the outset of our analysis, we acknowledge that this is an accelerated case pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). The deadline for this court to file its decision was September 19, 2025. However, respondent was granted two extensions of time to file her brief, delaying our review of the case by approximately nine weeks, so we find good cause to extend that deadline.

¶ 24 We further note that respondent's arguments on appeal are lacking. Although her brief on appeal contains lengthy quotes from the unfitness hearing, she fails to develop this information into any articulated argument. In fact, apart from briefly discussing depravity, she states only:

> "It is the Appellant/Mother's position that the above-referenced 'evidence' falls short of satisfying the burden of clear and convincing evidence. As such the Court's ruling finding that the State satisfied its burden of proof of unfitness of the Appellant/Mother by clear and convincing evidence—is against the manifest weight of the evidence."

It is unclear what specific grounds of unfitness respondent takes issue with on appeal or in what way she believes the evidence presented at the unfitness hearing was insufficient.

¶ 25 Courts are entitled to have the issues clearly defined and cohesive legal arguments presented. *Alms v. Peoria County Election Comm'n*, 2022 IL App (4th) 220976, ¶ 28. Failure to do so runs afoul of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which requires briefs on appeal to contain the "contentions of the appellant and the reasons therefor." We would be within our authority to consider respondent's arguments forfeited. See *Alms*, 2022 IL App (4th) 220976, ¶ 28 ("Where an appellant fails to present a cogent argument, that argument is forfeited."). However, because the general issues presented—whether the trial court's unfitness and best-

interests determinations were against the manifest weight of the evidence—are straightforward, we will address them.

¶ 26                                    A. Unfitness

¶ 27        Here, the trial court found respondent unfit with respect to both E.R. and X.O. on the ground that she was depraved. Section 1(D)(i) of the Adoption Act (Act) (750 ILCS 50/1(D)(i) (West 2024)) contains an enumerated list of crimes, a conviction for any one of which creates a rebuttable presumption of depravity and, therefore, parental unfitness. This presumption may be overcome only by clear and convincing evidence that a parent is not depraved. *Id.* Included within this list is the crime of aggravated battery of a child. *Id.*

¶ 28        Respondent does not appear to dispute that her conviction for aggravated battery to a child created the presumption that she was depraved. She argues instead that "one prior felony conviction alone has been held to be insufficient to automatically constitute depravity." While respondent is correct that section 1(D)(i) also provides that a rebuttable presumption of depravity is created where a parent has been criminally convicted of at least three felonies, this is a separate consideration from the enumerated list of crimes for which conviction of *any one crime* will create the same presumption. See *id.* Contrary to respondent's assertion, her conviction for aggravated battery to a child was sufficient to create the presumption that she was depraved.

¶ 29        The burden was on respondent to overcome this presumption, yet her brief fails to present any argument to that effect. She does note that her incarceration limited her ability to make progress in terms of securing employment and housing and completing certain services. However, while this might explain a lack of action on respondent's part, it does not constitute evidence that she is not depraved. Admittedly, respondent presented evidence that she had completed a parenting course and domestic violence course while incarcerated. However, the trial court noted that

because respondent was incarcerated and had not had the opportunity to demonstrate any progress in her parenting, it was uncertain if any real change had been made or if respondent was simply going through the motions. It therefore concluded the presumption created by her conviction had not been overcome.

¶ 30 We review the trial court's finding under the manifest-weight-of-the-evidence standard, reversing only where "the correctness of the opposite conclusion is clearly evident from a review of the evidence." *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004). Here, we cannot say the trial court's finding that respondent failed to overcome the presumption of depravity was against the manifest weight of the evidence.

¶ 31 Because any one ground of unfitness is sufficient to affirm the trial court, we need not address the court's conclusions with respect to the other grounds of unfitness alleged. See *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("Although the State may rely on several grounds in its petition, a finding adverse to the parent on any *one* ground is sufficient to support a subsequent termination of parental rights." (Emphasis in original.)).

¶ 32 B. Best Interests

¶ 33 Again, we note that respondent does not develop the arguments in her brief regarding the trial court's best-interests determination. She quotes large sections of the court's findings, recounts the evidence presented at the unfitness hearing, and then simply concludes that the court's finding that it was in the best interests of the minors to terminate her parental rights was against the manifest weight of the evidence.

¶ 34 However, regardless of the inadequacies of respondent's brief, the issue presented is a simple one. After a finding of parental unfitness, the trial court must determine if it is in the best interests of the minor to terminate parental rights. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071

(2009). In making this decision, the court must consider the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. *Id.*; see 705 ILCS 405/1-3(4.05) (West 2024). We will reverse a trial court's best-interests determination only if it is against the manifest weight of the evidence. *Jay. H.*, 395 Ill. App. 3d at 1071.

¶ 35        Here, the trial court heard evidence that both E.R. and X.O. were living in a foster home where they were well-taken care of, experienced love, and felt security. The home also provided an opportunity for permanence because their foster mother indicated the intent to adopt both children if possible. In contrast, because of her incarceration for aggravated battery to the minors' sibling, respondent has had little contact with her children for the majority of their lives, especially X.O. The trial court found that the minors were entitled to greater security than respondent could provide and it was in their best interests to terminate her parental rights. We cannot say this was against the manifest weight of the evidence.

¶ 36                                    III. CONCLUSION

¶ 37        For the reasons stated, we affirm the trial court's judgment.

¶ 38        Affirmed.