NOTICE

Decision filed 03/18/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250783-U

NO. 5-25-0783

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* JENNA L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Alexander County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-JA-14 |
| | ) | |
| Jennifer R., | ) | Honorable |
| | ) | Jeffery B. Farris, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE HACKETT delivered the judgment of the court.
Presiding Justice Cates and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's judgment terminating Mother's parental rights was not against the manifest weight of the evidence where the State met its burdens of proving that she was unfit to parent and that termination was in the best interest of the minor. Mother's due process rights were not violated during the removal of the minor or the adjudication of neglect. Mother failed to show any evidence of judicial bias or ineffective assistance of counsel. Therefore, the judgment of the circuit court is affirmed.

¶ 2    The respondent, Jennifer R. (Mother), appeals from the September 26, 2025, order of the

Alexander County circuit court terminating her parental rights over her minor child.[1] On appeal,

_____

[1]This appeal was accelerated pursuant to Illinois Supreme Court Rule 311(a), with a disposition deadline of February 26, 2026. Due to briefing extensions, we find good cause to extend this deadline. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

1

Mother challenges both the finding of unfitness and the determination that it was in the minor's best interest to terminate her parental rights. She also argues that the removal of the minor was done in violation of Mother's due process rights, that she received ineffective assistance of counsel, and that the circuit court was prejudiced against her. For the reasons explained below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This matter began when the Department of Children and Family Services (DCFS) received a report that a child, later identified as two-year-old Jenna L., had been found standing alone in the road dressed in pajamas and socks on the morning of November 4, 2019. Jenna was taken to the nearby post office, and the employees recognized her because she lived next door to the post office. An unidentified individual took the child to the home next to the post office, but Mother did not answer the door. Eventually, a relative came to the post office and was able to reunite the minor with Mother at the post office. According to DCFS reports, police visited Mother's home the following day and found the home to be in disarray, without working utilities or a working toilet. Mother appeared confused and unable to organize her thoughts. She denied drug use, but refused to submit to a drug test. Mother failed to notice the minor's absence for over 10 minutes, and could not explain how the minor was able to leave the house without her knowledge. The minor and Mother's other two children were taken into temporary protective custody on November 5, 2019.

¶ 5      On November 7, 2019, the State filed a petition for adjudication of wardship regarding the minor.[2] The State alleged that the minor was neglected due to (1) an environment injurious to her welfare, (2) not receiving the proper support or care necessary for her well-being, and (3) being

---

[2]The State also filed petitions in two separate cases for Mother's two other minor children, and named the respective putative fathers as respondents. The present appeal concerns only the case regarding Jenna L., and only Mother's parental rights. We will refer to the other children and the putative fathers only where relevant.

left alone by her parent without supervision for an unreasonable period of time without regard for her welfare. 705 ILCS 405/2-3(1)(a), (b), (d) (West 2018). The State also filed a motion for temporary shelter care, arguing that it was a matter of immediate and urgent necessity for the protection of the minor that she be removed from Mother's care. The circuit court granted the motion the same day, finding that there was probable cause to believe that the minor was dependent, the appointment of a temporary guardian was urgently and immediately necessary, it was in the minor's best interest that she be placed in foster care, and good cause existed as to why reasonable efforts could not prevent or eliminate the need for removal.

¶ 6                    A. Adjudication of Neglect and Initial Proceedings

¶ 7     DCFS submitted an initial service plan dated December 21, 2019, in advance of the adjudicatory hearing. It stated that Mother did not believe that her children were in danger or should have been removed from her care. Mother's service plan required cooperation with DCFS; maintain clean, safe, and adequate housing; and substance abuse services. DCFS also filed Mother's integrated assessment, dated January 28, 2020. The assessment listed two prior allegations of neglect against Mother, in February 2016 and October 2019, both of which were found to be "indicated" by DCFS. However, the present instance was the first time that her children were removed from her care. The assessment suggested that Mother had a substance abuse problem, but she refused to submit to drug testing. She was participating in visitation, but frequently required redirection due to speaking about the case to her children and leaving the room. She was resisting engagement in services. DCFS recommended her for mental health and substance abuse evaluations, as well as random drug testing.

3

¶ 8    The circuit court held an adjudicatory hearing that began on June 3, 2020, and continued on July 16, 2020,[3] and September 4, 2020. Mother was present at the June 3 setting with the first of her appointed attorneys, Brian Trambley. The circuit court heard testimony from Amy Ralls, a post office employee, who stated that she received a call from the post office about a child who had been found alone in the road nearby. A postal worker took her to the office and called Ralls for advice on what to do. Ralls contacted DCFS and conveyed the information she had received about the incident.

¶ 9    The circuit court also heard testimony from Bonnie Mouser, another post office employee who recognized the minor as Mother's child, who lived next door to the post office. She testified that she went to Mother's house and knocked several times at two different entrances, including beating on one of the doors with a piece of wood, but received no answer. The side door was slightly open, and Mouser called out, also with no response. Mouser returned with the minor to the post office. The minor's grandmother arrived at the post office but said that she could not take the child because this had happened before, and she had been told to contact law enforcement in such situations. Eventually, Mother came to take the minor home. Mouser estimated that she was with the minor before Mother's arrival for between 30 and 45 minutes.

¶ 10    Patricia Rhymer, the minor's maternal grandmother, also testified. She confirmed Mouser's account and explained that the police previously told her not to intervene because the minor could not be deemed to be in harm's way if her grandmother could be said to be taking care of her.

---

[3]The hearing on this date concerned only one of the other two minors, as her father made his first appearance in court. We discuss only the first and third days of the adjudicatory hearing.

4

¶ 11    Lastly, Officer Bruce Agbayani of the McClure Police Department testified. He conducted a welfare check at Mother's residence on behalf of DCFS on November 5, 2019. He stated that he observed the home and described it as very cluttered throughout, and the kitchen sink was full of dirty dishes. The stairs to her second-floor residence were rotten. The heat was turned off. Mother's boyfriend told Officer Agbayani that he was working on getting it turned on. The residence was heated only by space heaters.

¶ 12    On the final day of the adjudicatory hearing, September 4, 2020, Mother did not appear. Trambley, her attorney, informed the court that he notified Mother about the court date a month in advance, and she responded with her acknowledgment. The circuit court entered a default judgment against Mother over counsel's objection. An adjudicatory order was entered the same day, with the court finding the minor neglected due to an environment injurious to her welfare.

¶ 13    The circuit court set a date of October 21, 2020, for the dispositional hearing. On that date, Trambley informed the court that Mother wished to move to represent herself. Mother then spoke, adding that she also wanted to move for the default judgment entered against her at the adjudicatory hearing to be withdrawn, stating that she had overslept that day. The circuit court warned Mother about representing herself when she had no legal training or ability. Mother responded that she had asked Trambley to file various motions on her behalf, including a motion to hold an emergency hearing and an objection to DCFS's service plan, and he had not. The circuit court declined to rule on Mother's request that day, instead continuing the hearing and instructing her to try to work something out with Trambley in the meantime.

¶ 14    Prior to the next hearing date, Trambley filed a motion for leave to withdraw as counsel, attaching a letter that Mother wrote to him stating her intent to represent herself. The circuit court granted the motion on January 5, 2021. The dispositional hearing reconvened on January 28, 2021,

with Mother appearing *pro se*. The circuit court began by explaining to Mother how being represented by counsel would be helpful and beneficial to her goal of reuniting with her children, and asking her to allow the court to appoint her a new attorney. Mother agreed to a new attorney, and the court appointed Addam Holder to represent her and continued the hearing.

¶ 15    Mother failed to appear at the next dispositional hearing date of May 11, 2021, although her new attorney was present. The circuit court entered a default judgment against Mother, over counsel's objection. In its written order from the same date, the circuit court found Mother to be unable to care for the minor, and adjudicated the minor to be neglected. The minor was made a ward of the court.

¶ 16    The circuit court entered permanency orders in this case on November 10, 2021, June 14, 2022, January 11, 2023, and July 12, 2023. In the first two of these, the circuit court found that Mother had failed to make reasonable and substantial progress toward the return of the minor, her service plan was reasonable and appropriate, and DCFS had made reasonable efforts in providing services to assist Mother in achieving the permanency goal of return home within 12 months. In the latter two, the circuit court made the same findings regarding Mother's progress and DCFS's service plan, but the appropriate permanency goal was found to be substitute care pending termination of parental rights.

¶ 17    The State filed a motion for termination of Mother's parental rights on December 12, 2023. It alleged that Mother was an unfit parent pursuant to the Adoption Act due to (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare; (2) failure to protect the child from conditions injurious to her welfare; (3) failure to make reasonable efforts to correct the conditions that led to the child's removal during any nine-month period following the adjudication of neglect; and (4) failure to make reasonable progress toward

6

the return of the child during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(b), (g), (m)(i), (m)(ii) (West 2022).

¶ 18                                 B. Fitness Hearing

¶ 19     DCFS and Lutheran Social Services of Illinois (LSSI) filed several reports and service plans in advance of the fitness hearing. LSSI's February 2024 status report stated that Mother only became more active in attending visitation after the permanency goal was changed to substitute care pending termination of parental rights in December 2023. Prior to that, she was described as very inconsistent with her visits. She was also arrested for burglary and methamphetamine charges on May 18, 2023. It was only after her arrest that she began to engage in services.

¶ 20     DCFS's latest service plan before the hearing, dated April 16, 2024, indicated that Mother was rated unsatisfactory on cooperating with DCFS, was only sporadically attending visitation, had not obtained safe and suitable housing, and had not shown proof of current employment. As to substance abuse, an assessment in February 2022 recommended no further treatment, but DCFS wrote that this was based on self-reported information. Mother tested positive for methamphetamine in February 2023, but the service plan of April 2024 rated her as satisfactory, indicating that she had engaged in evaluations and her last three tests were negative.

¶ 21     The fitness hearing began on July 16, 2024. Mother appeared with her fourth attorney in this case, Ted Thompson.[4] LSSI permanency supervisor Amanda Moore testified that she was assigned to Mother's case and prepared a permanency report for the court in April 2022, which was also when Moore started on Mother's case. Moore explained that Mother had had several service plans over the course of the case, and that mental health services were added to the original plan because of reported trauma in Mother's past.

_____

[4]A third attorney represented her from January 9, 2024, until March 12, 2024.

7

¶ 22    Moore testified that Mother had not completed any of her required services at any time while Moore was involved with her case. There was also little to no cooperation from Mother. Moore stated that Mother would report that she had completed services, but would not sign releases of information for the alleged providers. She also refused drug testing, which Moore said was important because although this was not a reason why the minor was removed, Mother had a documented history of methamphetamine use—a point that Moore had explained to Mother.

¶ 23    The condition of Mother's home, on the other hand, was one of the reasons that the minor was removed and the case initiated, and Moore testified that she had asked Mother about how she was securing safe housing for the minor. On a couple of occasions, Mother told her that she was moving to a home in Missouri, to which Moore responded that Mother must provide the address so that it could be inspected. As far as Moore was aware, Mother was still currently living at the residence from which the minor was removed.

¶ 24    Regarding visitation, Moore could not recall how many of her 94 total scheduled visits Mother had missed, but said it was more than 10 over the course of Moore's involvement. However, she believed that Mother had missed several visits at the start of the case as well. Mother originally had weekly hour-long visits with the minor, but this was changed to once a month after the permanency goal became substitute care pending termination of parental rights.

¶ 25    The minor's current caseworker at LSSI, Laureen Doty, testified on the second day of the hearing, August 22, 2024. She was assigned to the case around November 2022, at which point Mother was not participating in services, acknowledging service plans via signature, or signing releases. The reason Mother gave for not signing service plans was that she believed the allegations regarding her cluttered house and its lack of utilities to be untrue. Doty also requested proof of

income, but Mother only submitted one paycheck. Mother had not shown that she had a stable source of income.

¶ 26    Regarding drug testing, Doty was able to have Mother tested twice, and both were negative. However, Mother failed to appear for her most recent scheduled drug test. While Mother had completed a substance abuse assessment and agreed to any recommendations stemming from it, she was still rated unsatisfactory on substance abuse services due to her resistance to drug testing.

¶ 27    Doty had also visited Mother's home, which she described as an "old shed," consisting of one large room that was so cluttered with objects, there was nowhere to sit down. The bathroom was just a toilet and sink without any walls closing it off from the main room. In February 2023, Doty informed Mother that she was able to get funds for housing, but Mother said she wanted to stay in her current home and make it suitable. Doty stated that Mother never requested assistance from LSSI to obtain public housing. As of the hearing date, Doty did not know where Mother was living, as she did not keep LSSI informed of her address.

¶ 28    Regarding visitation, Doty rated Mother's participation as unsatisfactory, as Mother would fail to call ahead to confirm visits, or simply fail to show up. Doty testified that, while Mother appeared to love the minor, her degree of interest in raising her was unsatisfactory, not going beyond providing the very basic needs. Doty added that the minor was currently thriving in her foster placement, in part because of the opportunities to receive education that Mother was not providing for her.

¶ 29    Doty opined that, since the permanency goal was changed to substitute care pending termination around March of 2023, Mother made some efforts to correct some of the conditions that brought the minor into care. However, she did not seem to take responsibility for these

conditions. There was also currently no place for the minor to go home to, as Mother did not have a stable income or housing.

¶ 30 Mother's sister, Liberty Weber, also testified. The minor had been placed in foster care with Weber since the start of the case in November 2019. Weber stated that Mother did not communicate with her about the minor.

¶ 31 Next, Mother's friend, Kasie Allen, testified. She said that Mother had made an "amazing amount" of effort to try to get her daughter back, and dedicated her life to doing so. Allen described a briefcase full of papers that Mother kept about the case. Allen also testified that she sometimes hired Mother to do some work for her at her property company, mowing lawns and doing other maintenance work. These were occasional jobs whenever Allen needed something done, and not regular employment. However, Allen stated that Mother had a couple of other jobs, working in home care and mowing lawns.

¶ 32 Lastly, Mother testified. She said that she was aware of the goals in her service plan, and believed she had been compliant with everything required of her. Regarding the last drug test she missed, she said that Doty called her earlier that day, while Mother was working. By the time she saw the message, she was unable to make it to the test in time. She added that she had asked Doty "many times" to drug test her. Mother also explained that she missed her last visitation due to transportation issues, and LSSI did not provide alternate transportation for her. She said that visits with the minor went very well, and she always brought activities and snacks for the minor.

¶ 33 Mother described Doty as "not supportive" of reunification. Mother said that she kept asking Doty to help her with housing, but Doty told her that public housing funds were not available. Mother testified that she tried to sign up for a waiting list for public housing in two different counties, but ultimately was not accepted. Regarding her house, she said that there was a

10

wall set up to partition the bathroom from the rest of the house, and it had working plumbing, electricity, and running water. She said she was employed by a home care company and took additional jobs on the side to earn extra money, doing primarily mechanical work.

¶ 34    Mother claimed that she was not aware that the permanency goal would change to substitute care pending termination, saying that she was "definitely sideswiped." She also said that she tried to find out from Doty or Weber about the minor's activities, such as her t-ball schedule or medical appointments, so that she could come and support her, but neither would communicate with her to facilitate contact.

¶ 35    After hearing arguments, the circuit court opined that, over the pendency of the case, Mother appeared to go through "jolts" where she would decide to start participating, and if the attorney representing her at the time "did not see things the way that she thought that they should be seen, she went on her own expedition." This included repeatedly asking the clerk of the court for voluminous copies of matters that were already decided, and were "too little too late." The circuit court concluded that, rather than listen to her attorneys, Mother was on a "quest to show that someone's done her wrong."

¶ 36    The circuit court also opined that, based on her testimony, Mother was choosing not to see the urgency of her situation. The court referenced the missed visits, unsigned releases, and refusals to be drug tested. The court found two separate nine-month periods in which Mother failed to make reasonable progress towards the return of the minor. Regarding her conflicts and failures to communicate with her caseworkers, the circuit court recognized that communication was "a two-way street" and that LSSI also had to work with her, but said that Mother could not ignore her service plan requirements because she did not like her caseworker and did not think she should have to take these steps. She also could not "pick and choose" when she showed up to court.

11

¶ 37    Next, the circuit court found no reason for Mother to have been turned away from public housing across multiple counties, and based on the caseworkers' testimony, the public housing options would have satisfied DCFS's requirements for safe housing. She also had the means and the time to find a suitable residence to rent. The circuit court further found that her claim of never having been presented with a service plan lacked credibility. The circuit court thus terminated Mother's parental rights.

¶ 38    On August 22, 2024, the circuit court entered a written order finding Mother to be an unfit parent on the following bases: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare; (2) failure to protect the child from conditions within her environment that were injurious to her welfare; and (3) failure to make reasonable efforts[5] to correct the conditions that caused the child to be removed during any nine-month period following the adjudication of neglect or abuse.[6]

¶ 39                          C. Best-Interest Hearing

¶ 40    The best-interest hearing took place on September 25, 2025. The circuit court took judicial notice of the evidence presented at the fitness hearing and the reports filed in the case. The reports included, among other things, status reports filed by LSSI on August 22 and September 4, 2025, which stated that the now-eight-year-old minor had been living with her maternal aunt since the start of the case in 2019. Her educational needs were being met, she was developmentally on track,

---

[5]The order was silent on the issue of reasonable progress.

[6]The circuit court also entered a docket entry on this date, including the basis of failure to make reasonable progress towards the return of the child during any nine-month period following the adjudication of neglect or abuse. This is also reflected in the circuit court's oral findings at the fitness hearing, at which the court stated that it found Mother not to have made reasonable progress during any nine-month period.

The circuit court's written order also includes a finding that it is in the child's best interest that Mother's parental rights be terminated; however, the circuit court held a later best-interest hearing, at which it made this finding and entered a second written order with the same language. Apparently, the best-interest language in the first order, as well as the language terminating Mother's parental rights, were prematurely entered in error.

12

and her grades were good. She was engaged in several extracurricular activities throughout the year. The minor also attended weekly counseling. She had a close bond with her caregivers and strong support from people in her family and the community. DCFS also filed a service plan dated April 15, 2025, which confirmed the minor's bond with her aunt and uncle, as well as her positive performance at school. It stated that the minor was healthy and up to date on all medical appointments, and she was able to see her brother and sister on a regular basis.

¶ 41    At the best-interest hearing, LSSI child welfare specialist Toni Furlow testified that she had been assigned to the minor's case in November 2024, and had observed the minor at the home of her aunt and foster mother, Liberty Weber. She described the minor's interactions with Weber as "very good," and said that Weber parented her very well, including when the minor was upset. Furlow added that the relationship between Weber and the minor appeared very close and loving. The minor maintained good grades in school, and Weber ensured that she was actively engaged in various extracurricular activities during both the school year and summer. Weber was very patient and proactive in handling the minor's oppositional defiant disorder, and made sure she attended counseling.

¶ 42    Furlow also spoke of the minor's strong bond with her uncle, Weber's husband, stating that he was a loving and supportive presence in her life. Furlow testified that the minor had her own room in the home, with plenty of age-appropriate clothing, furniture, and other items provided by the Webers. The minor appeared to feel at home with them, and whenever Furlow asked her in private whether she felt safe, she indicated that she did. The minor's brother also lived nearby and frequently visited the Webers; the minor got along well with him. Lastly, Furlow stated that the Webers told her that they wished to adopt the minor.

¶ 43    LSSI permanency supervisor Amanda Moore, who had testified at the fitness hearing, testified again. She reiterated that Mother had missed a concerning number of visits during the time that Moore was assigned to her case.

¶ 44    Liberty Weber also testified again. She said that the eight-year-old minor had been living with her as a foster placement for approximately six years, but had known her all her life. The Webers also had a son who lived with them, and the minor got along with him "like any kid gets along with their brother"—they argued, but they also stood up for each other. Weber further testified that she was able to foster a relationship between the minor and her biological siblings, stating that the minor's 12-year-old brother visited often and her adult older sister, who lived further away, would call her.

¶ 45    Regarding the minor's relationship with her uncle, Weber said she was a "daddy's girl," closer with him than with Weber herself, since Weber was the more disciplinarian parent. Weber explained how she and her husband took the minor to school and medical appointments, involved her in extracurriculars, clothed her, and otherwise cared for her. She stated that the minor considered the Webers' home to be her own, and called the Webers mom and dad. Weber said that she had one DUI conviction, from age 21. She was currently 48 years old, and had no criminal history since then. She also testified that when the minor would come home after visitation on the dates that Mother missed, the minor would be upset. Often, the minor would act out and get in trouble at school after seeing Mother; this was why she started counseling to address her behavioral issues.

¶ 46    Tricia Davidson testified on behalf of Mother as her friend of approximately two years. She stated that she had observed a strong bond between Mother and the minor, and described a time when she saw the minor run excitedly to her mom after playing on the playground.

¶ 47　Donna McCann, the minor's guardian *ad litem* (GAL), testified that the last time she visited the minor at Weber's home was a couple of years ago, and at that time, she found the home to be clean, prepared for children, and without any noticeable faults. In her examination of the GAL, Mother asked whether she believed that Mother would ever put her in any danger or risk of harm. The GAL answered that while she did not think Mother would do so willingly, she feared that it would happen. She explained that this was because Mother might not "have the wherewithal to understand the needs of her child and what would be safe."

¶ 48　Lastly, Mother testified about the day of the incident that led to the minor's removal. She said her boyfriend had come over, and when he left the house, he left the door open. That was how the minor got out. She also mentioned certain other individuals she had wanted to subpoena as witnesses in her case. She asserted that she completed what was required of her to have the minor returned to her care, and explained her multiple missed court appearances as times when she felt like giving up because she thought everyone had already made up their mind about the case without involving her. The circuit court addressed Mother, saying that she never took ownership of her role in the removal and largely did not participate in the case, both of which Mother denied. Instead, she blamed her attorneys for not fighting for her, as well as the GAL and caseworkers. She further argued that her constitutional rights were violated because DCFS did not obtain a warrant to remove the minor.

¶ 49　After hearing argument, the circuit court found that, having considered all of the evidence and the statutory best-interest factors, it was in the best interest of the minor that Mother's parental rights be terminated. The circuit court entered a written order on September 26, 2025, confirming its prior unfitness finding and further finding that it was in the minor's best interest that Mother's parental rights be terminated. Mother filed a timely notice of appeal.

15

¶ 50                              II. ANALYSIS

¶ 51     On appeal, Mother argues that the circuit court's findings that she was an unfit parent and that termination of her parental rights was in the minor's best interest were against the manifest weight of the evidence. She additionally argues that the removal of the child violated Mother's due process rights, she received ineffective assistance of counsel, there was judicial bias, and the termination order is "conclusory, boilerplate, and legally insufficient." We begin by addressing her claims regarding the circuit court's findings of unfitness and best interest.

¶ 52     However, before doing so, we must address two preliminary matters. We first note that Mother does not cite to the record in her statement of facts, as required by Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). Illinois Supreme Court Rule 341 requires that the appellant's brief include a statement of facts "with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1. 2020). Furthermore, a reviewing court "is not a depository in which the burden of argument and research may be dumped." *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 80.

¶ 53     Our supreme court rules "are not advisory suggestions, but rules to be followed." *Zale v. Moraine Valley Community College*, 2019 IL App (1st) 190197, ¶ 32. We recognize that Mother is proceeding *pro se* on this appeal. However, her *pro se* status does not relieve her of the burden of complying with the court's rules. *Holzrichter*, 2013 IL App (1st) 110287, ¶ 78. When an appellant's brief does not follow these rules, we have the inherent authority to dismiss the appeal. *Id.* However, we also have discretion to consider the arguments on their merits in the interest of obtaining a just result, and we choose to do so here. See *Epstein v. Davis*, 2017 IL App (1st) 170605, ¶ 22.

¶ 54    Next, Mother does not include a transcript of the shelter care hearing in the record on appeal, despite raising issues that allegedly took place at that hearing. It is the appellant's duty to provide a sufficiently complete record of the lower court proceedings to support the claims on appeal. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 318-19 (2003). If the relevant proceedings were not recorded and no transcript exists, the appellant is obligated to file a bystander's report or an agreed statement of facts. *Id.*; Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017). In the absence of a sufficiently complete record on appeal, "the reviewing court will presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. [Citations.] The court will resolve any doubts arising from the incompleteness of the record against the appellant." *Rogers*, 204 Ill. 2d at 319; see also *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Furthermore, Mother is not entitled to a more lenient standard due to her *pro se* status, and must abide by the same rules as an appellant who is represented by counsel. *Holzrichter*, 2013 IL App (1st) 110287, ¶ 78.

¶ 55    In the present matter, the record on appeal includes only a partial transcript of the shelter care hearing that took place on November 7, 2019, after which the circuit court ruled that there was probable cause to find that the minor was dependent and that DCFS was granted temporary custody of the minor. This hearing and resulting order form the basis of Mother's argument on appeal regarding due process violations in the removal of the minor from Mother's care. It appears that only the very beginning of the hearing was transcribed, and the remainder, in which the circuit court heard evidence and argument and gave its ruling, was not recorded.

¶ 56    Without a full explanation in a written order, a transcript of the hearing, or a bystander's report or agreed statement of facts, we cannot determine whether the circuit court's ruling was in error. See *King v. Find-a-Way Shipping, LLC*, 2020 IL App (1st) 191307, ¶ 31 (where record did

17

not contain any evidence to support appellant's claim that the trial court applied an incorrect standard, reviewing court presumes that the challenged decision was fully supported by evidence presented to the trial court). We therefore presume that the circuit court's findings and determinations were properly supported by legal authority and the evidence before the court.

¶ 57                    A. The Circuit Court's Finding of Unfitness

¶ 58    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P*., 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re Gwynne P*., 215 Ill. 2d at 354. Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2024); 750 ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 59    Here, the circuit court based its unfit-person ruling on a lack of reasonable interest, concern, or responsibility; a failure to protect the minor from conditions injurious to her welfare; and a lack of reasonable efforts. Section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed unfit. However, only one properly proven ground is sufficient to enter a finding of unfitness. See 750 ILCS 50/1(D) (West 2024) (stating that the grounds of unfitness "are any one or more" of an enumerated list); see also *In re C.W.*, 199 Ill. 2d 198, 210 (2002).

18

¶ 60    As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
>
> * * *
>
> (b) Failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare.
>
> * * *
>
> (g) Failure to protect the child from conditions within his environment injurious to the child's welfare.
>
> * * *
>
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(b), (g), (m)(i) (West 2024).

¶ 61    A finding of unfitness under subsection (D)(b) of this provision is based on a subjective analysis, which focuses not on the parent's success, but rather on the reasonableness of his efforts, taking into account his particular difficulties and circumstances. *In re D.P*., 2024 IL App (1st) 231530, ¶ 33. Simply demonstrating some interest in or affection towards the child does not render a parent fit under this subsection; rather, his interest, concern, and/or responsibility must be reasonable. *Id*. Furthermore, "[b]ecause the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness." *Id*. Unlike subsection (D)(m), subsection (D)(b) has no time constraint that limits our consideration of Mother's fitness. *Id*. Both noncompliance with a service plan and infrequent or irregular visitation with the child have been held to be sufficient evidence warranting a finding of unfitness under this subsection. *Id.* (quoting *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 62    Regarding subsection (D)(g) of the Adoption Act, our supreme court has held that a parent cannot be found unfit based on a failure to protect the child during any time in which the child was removed from the injurious home environment and living in foster care. *In re C.W.*, 199 Ill. 2d at 212. Furthermore, the clear and unambiguous statutory language does not permit a finding under

this subsection to be based on evidence that the parent failed to correct or improve the conditions in her environment following the removal of the minor. *Id.* at 212-13. However, such evidence was relevant to other bases for unfitness, such as subsection (D)(m) of the Adoption Act. *Id.* at 213-14. Furthermore, a finding of unfitness under subsection (D)(g) may properly be based on evidence of the parent's conduct before removal, including the same evidence that led to the removal. *Id.* at 218-20; *In re J.B.*, 2014 IL App (1st) 140773, ¶ 58.

¶ 63    Here, the circuit court did not identify whether it specifically relied on evidence of the home environment before or after removal. However, one of the bases for the court's finding of neglect was the condition of the home in which Mother and the minor were living before removal. The circuit court found that the minor was neglected due to an environment injurious to her welfare due to the very cluttered and unclean nature of the home, its lack of working heat, and the lack of a functioning toilet. These conditions clearly existed before the minor's removal, and the record on appeal shows that this environment was largely unchanged over the course of the case. Mother's caseworkers could not confirm that Mother was still living in this residence because she failed to update them on her current address.

¶ 64    Under the Adoption Act, "reasonable effort" is "a subjective standard and refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. The court must determine "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *Id.*

¶ 65    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned

20

to view and evaluate the parties and their testimony. *Id*. Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id*. A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id*.

¶ 66    On appeal, Mother challenges the circuit court's unfitness finding by arguing that DCFS failed to provide her reasonable services and assistance as required by statute, including specifically the failure of her caseworker to appear at hearings or "adequately assist" Mother. She does not allege that she actually made reasonable efforts, and only claims that the circuit court's finding of lack of reasonable effort was improper where said lack of effort was due to DCFS's failure to adequately support her.

¶ 67    Furthermore, Mother does not challenge the circuit court's unfitness findings on the basis of failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare, or failure to protect the child from conditions within her environment that were injurious to her welfare. As Mother does not contend that the circuit court erred in any of its other findings upon which it based its ruling of unfitness, we need not address Mother's argument regarding DCFS.

¶ 68    However, even if we consider this argument, the record on appeal does not support Mother's position that DCFS failed to assist her in completing her services. In support of this position, Mother cites to an unspecified portion of section 2-28 of the Juvenile Court Act. 705 ILCS 405/2-28 (West 2024). Mother is broadly correct that this section does provide that DCFS must take some steps in order to justify a finding of reasonable efforts or progress by the parent, to ensure the safety and well-being of the minor, to assist in the placement of the minor, and to provide evidence to the court at all hearings. However, the record here shows that it was Mother

who failed to cooperate with DCFS and work towards the completion of the services assigned to her, rather than DCFS failing to provide her with "the support, guidance, and oversight necessary to comply with case requirements," as she alleges. As Mother has abandoned any argument regarding any of the circuit court's other bases for its unfitness finding, and the record does not support her position as to the court's finding of lack of reasonable progress, we conclude that the circuit court's unfitness determination was not against the manifest weight of the evidence.

¶ 69    Lastly, Mother argues that the circuit court was required to identify a specific nine-month period following the adjudication of neglect in order to make a finding of lack of reasonable efforts. The authority to which she cites in support of this argument does not stand for such position. Additionally, the circuit court explained in its ruling that the State had proven by clear and convincing evidence that any applicable nine-month period would suffice.

¶ 70                      B. The Circuit Court's Best-Interest Finding

¶ 71    Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 72    In making a best-interest determination, the court must consider several factors, within the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2024). The factors are as follows:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense

22

of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

¶ 73     As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *Id.* ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 74     On appeal, Mother argues that the circuit court's ruling was against the manifest weight of the evidence because the GAL failed to perform the duties required of her by statute. Specifically, Mother contends that the GAL failed to "meaningfully participate in the case for several years," failed to visit the minor for approximately two years prior to the best-interest hearing, and did not conduct an independent investigation as required under section 2-17 of the Juvenile Court Act. 705 ILCS 405/2-17 (West 2024).

¶ 75     Section 2-17 of the Juvenile Court Act provides for the appointment of a GAL to represent the best interests of the abused or neglected minor and to make recommendations to the court consistent with that duty. *Id.* § 2-17(1). The section further requires that the GAL

> "shall have a minimum of one in-person contact with the minor and one contact with one of the current foster parents or caregivers prior to the adjudicatory hearing, and at least one additional in-person contact with the child and one contact with one of the current foster parents or caregivers after the adjudicatory hearing but prior to the first permanency hearing and one additional in-person contact with the child and one contact with one of the current foster parents or caregivers each subsequent year. For good cause shown, the judge may excuse face-to-face interviews required in this subsection." *Id.* § 2-17(8).

Contrary to Mother's argument, this section does not require that the GAL conduct an independent investigation.

¶ 76    Here, the record on appeal includes the GAL's testimony at the best-interest hearing. She testified that it had been a couple of years since she had visited with the minor in the foster home, and that she could testify to the information she received regarding the minor. The GAL also filed periodic reports with the court, contrary to Mother's assertion on appeal that the GAL never submitted any reports.

¶ 77    The record also does not indicate whether the GAL made any face-to-face contact with the minor outside of the foster home during the two-year period prior to the best-interest hearing, as she was not asked about this during her testimony. Nor does the record show whether she had any non-face-to-face contact with the minor, and whether the circuit court allowed such contact. Subsection (8) of section 2-17 does not require that the GAL's contact with the minor occur in the foster home.

¶ 78    In making its best-interest determination, the circuit court considered not only the testimony and reports of the GAL, but the testimony of all of the other witnesses, including Mother, and all other reports filed in advance of the best-interest hearing. We previously summarized all of this evidence, as well as the circuit court's application of that evidence to the relevant statutory factors; we refer to that discussion here. Mother does not challenge any of the other evidence, and does not make any argument that the circuit court improperly applied or failed to consider any of the statutory best-interest factors pursuant to section 1-3(4.05) of the Juvenile Court Act. 705 ILCS 405/1-3(4.05) (West 2024). We therefore conclude that the circuit court's best-interest determination was not against the manifest weight of the evidence.

¶ 79                              C. Due Process Violations

¶ 80    Mother additionally argues that her due process rights were violated when the minor was removed from her care because (1) the circuit court never "invoked emergency jurisdiction" or

24

entered an order based on "sworn evidence and specific findings" prior to the removal, (2) the removal was conducted without a warrant or any immediate threat to the minor, and (3) Mother was denied a meaningful opportunity to challenge the removal due to the DCFS employee who conducted the removal never testifying in court and the circuit court's alleged reliance on hearsay evidence and an incomplete record.

¶ 81    Mother provides no valid supporting authority for the abovementioned arguments. The caselaw that she cites either does not exist or does not stand for the propositions that she claims it does. While Mother cites to a few provisions of the Juvenile Court Act, none mention a warrant requirement, any concept of emergency jurisdiction, or any of the other supposed statutory mandates that she argues were not followed in the removal of her child.

¶ 82    Section 2-5 addresses taking a minor into custody, stating that a law enforcement officer may, without a warrant, take into temporary custody a minor who the officer reasonably believes to be abused, neglected, or dependent. 705 ILCS 405/2-5(1) (West 2018). After taking the minor into custody without a warrant, the officer must place the minor in temporary protective custody and immediately notify DCFS. *Id.* § 2-6(b). Upon the filing of a verified petition through the state's attorney setting forth sufficient facts to establish abuse, neglect, or dependence, the court must hold a temporary custody hearing within 48 hours of the minor being taken into temporary protective custody. *Id.* §§ 2-9(1); 2-13(1), (2).

¶ 83    In addition to the deficiencies in her citation to relevant authority, Mother mischaracterizes the circumstances of the minor's removal. The record on appeal shows that DCFS responded to a call made on November 4, 2019, that the minor had been found standing in the road, alone. After the minor was returned to Mother, police came to her home and found it in disarray and without working utilities or toilet. DCFS then became involved and spoke with Mother. Mother appeared

25

confused and could not explain how her two-year-old was able to leave the house for so long unnoticed. The minor was taken into temporary protective custody on November 5 or 6, 2019, and the State filed a petition for adjudication of wardship and motion for temporary shelter care on November 7, 2019.

¶ 84　A shelter care hearing was held on November 7, 2019, within the 48 hours required by statute. A fragment of this hearing is available in the report of proceedings, and it indicates that Mother was present in court on that date. No transcript or bystander's report exists for the majority of the hearing, and we therefore presume that the circuit court's resulting order for temporary shelter care was adequately supported by legal authority and the evidence presented. The order states that the circuit court heard the evidence and found probable cause to believe that the minor was dependent, there was an urgent and immediate necessity for the appointment of a temporary custodian, it was in the minor's best interest to be placed in foster care, and good cause was shown as to why reasonable efforts could not prevent or eliminate the need to remove the minor from the home. The circuit court also placed the minor in the temporary custody of DCFS. There is no indication that any point of the temporary custody proceedings did not comply with the Juvenile Court Act.

¶ 85　Even looking past the incompleteness of the record, it is clear from the reports detailing why and how DCFS became involved in Mother's case that no warrant was needed under the Juvenile Court Act. It was reasonable for the officer who came to Mother's home to believe that the minor was abused, neglected, or dependent under the Juvenile Court Act where it was already apparent that keeping the minor in the home and under Mother's care could lead to incidents such as the one that brought the matter to DCFS's attention. The state of the home was also concerning, as basic utilities were not available. Furthermore, Mother appeared confused and unable to

26

organize her thoughts, and she could not explain to law enforcement how the minor was able to leave the home unnoticed. Mother never disputed that she remained unaware of the minor's absence for some time, nor does she deny this on appeal. Mother has failed to show that law enforcement required a warrant to take the minor into temporary custody or otherwise failed to comply with the Juvenile Court Act.

¶ 86 Lastly, Mother argues that she was denied her right to challenge the factual basis for the minor's removal because the DCFS employee who actually conducted the removal did not testify in court. She further states that this applies to "all hearings following the removal." She also cites to the transcript of the first day of the adjudicatory hearing, June 3, 2020, where Officer Agbayani testifies about his oral report to DCFS after conducting a welfare check at Mother's home. He states that he provided the information to DCFS for the department to make a decision regarding removal.

¶ 87 Mother does not explain how she was prevented from challenging the removal at any hearing. The adjudicatory hearing was the first hearing in this case during which the circuit court heard witness testimony. The circuit court also reviewed DCFS's report filed in advance of the hearing. Mother cites sections of the Juvenile Court Act that she claims provide parents with certain statutory protections that were not afforded to her during the initial proceedings in this case. She does not specify what those are, the subsections in which she claims they may be found, or how she was not able to fully challenge the removal as a result. We therefore maintain our determination that no due process violations occurred.

¶ 88 D. Ineffective Assistance of Counsel

¶ 89 Parents have a statutory right to the effective assistance of counsel in termination proceedings. *In re Br. M*., 2021 IL 125969, ¶ 42. Although the source of the right to counsel is

27

statutory, we evaluate such claims under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). Under this standard, the parent must demonstrate (1) that counsel's performance fell below an objective standard of competence and (2) that the deficient performance prejudiced the parent. *In re Br. M.*, 2021 IL 125969, ¶ 43.

¶ 90    In conducting our review, we may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 93. To show prejudice, the parent must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* ¶ 92. Additionally, she must "overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy," as "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

¶ 91    Mother first claims that she received ineffective assistance from "multiple appointed attorneys," citing three specific instances of the alleged ineffective assistance. She first contends that her appointed counsel at the continued adjudicatory hearing on September 4, 2020, Trambley, allowed for her due process rights to be violated when a default judgment was entered against her because she was not personally present, despite appearing through counsel.

¶ 92    The State responds that the time to challenge the September 4, 2020, default judgment has long passed, and Mother has thus forfeited this argument. We agree. An order adjudicating a minor to be abused or neglected may be appealed from directly, with the court's permission, as an interlocutory order affecting the care and custody of an unemancipated minor. Ill. S. Ct. R. 306(a)(5) (eff. Oct. 1, 2020); *In re Leona W.*, 228 Ill. 2d 439, 455-56 (2008). Such order may also

28

be challenged through an appeal of the subsequent dispositional order, which is a final order. *In re Leona W.*, 228 Ill. 2d at 456-57. Appeals from final judgments in proceedings under the Juvenile Court Act are governed by the same rules applicable in civil cases, and thus require that the notice of appeal be filed within 30 days after entry of the judgment or after entry of the order disposing of any posttrial motions, if any were filed. *Id.*; Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017).

¶ 93     While we lack jurisdiction to address this forfeited issue, and make no ruling on it here, we note that the report of proceedings from the hearing on September 4, 2020, shows that Trambley told the circuit court that he had notified Mother of the date for the continuation of the adjudicatory hearing and she had confirmed it with him. The circuit court entered the default judgment against her over Trambley's objection. Mother cannot allege that her own failure to appear on a court date, for which she confirmed receiving notice, was due to her appointed counsel.

¶ 94     Next, Mother argues that she received ineffective assistance from her fourth attorney, Thompson, because he allegedly failed to file certain "necessary motions." Mother then attempted to file these motions herself, but the circuit court did not accept them. Mother does not explain the nature of the motions to which she refers, nor does she cite to any portion of the record on appeal to argue that she tried to file any motions or that her attorney should have filed certain motions. Moreover, she does not explain how the outcome of her case would have been different had her appointed counsel filed these alleged motions. Thus, she has satisfied neither prong of the *Strickland* standard.

¶ 95     Mother's last contention is that Thomspon failed to subpoena "most of the witnesses" that Mother requested at the fitness hearing and did not ask "key questions" during cross-examination. She does not state who these potential witnesses were, what testimony they were expected to provide, or how that testimony would have changed the outcome of her case. She also does not

29

provide this information regarding the supposed questions that her attorney should have asked on cross-examination, satisfying neither *Strickland* prong for this part of her ineffective assistance claim. We therefore find that Mother has not met her burden of showing ineffective assistance of counsel.

¶ 96                              E. Judicial Prejudice or Bias

¶ 97    Lastly, Mother argues that that circuit court's conduct evinced bias against her by allegedly making "disparaging remarks regarding [Mother's] choice to represent herself." She further contends that the circuit court referred to *pro se* litigants as "fools" and pressured her to accept appointed counsel, undermining her right to represent herself and interfering with her ability to litigate effectively. She adds that the circuit court's alleged pressure forced her into accepting representation by counsel whom she had previously rejected due to providing ineffective assistance.

¶ 98    Our supreme court has explained that judges are "presumed impartial, and the burden of overcoming the presumption by showing prejudicial trial conduct or personal bias rests on the party making the charge." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31. Regarding a judge's conduct during a trial, our supreme court relies on the United States Supreme Court's explanation that

> " '[o]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' " (Emphases in original.) *Eychaner v. Gross*, 202 Ill. 2d 228, 281 (2002) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

30

¶ 99   In support of her argument, Mother points to one instance in the record where the circuit court refers to a "fool," and one instance where the circuit court allegedly pressured her to accept representation by counsel. The word "fool" appears at two points in the report of proceedings. At the dispositional hearing held on October 21, 2020, the circuit court stated as follows:

"There's an old saying that the person who represents himself has a fool for an attorney. I'm not calling you a fool *** [b]ut I'm saying *** with no disrespect to you at all, I don't know that you have the legal training and ability to represent yourself better than Mr. Trambley can."

The circuit court concluded the hearing on that date with an explanation to Mother as to why this particular attorney was often appointed in "very intense" parental rights cases such as hers, because of his skill and experience. The court then stated that it declined to rule on Mother's motion to proceed *pro se*, and asked Mother and Trambley to "try to make this work" before the next hearing date.

¶ 100   At the next hearing, the circuit court again used the word "fool," after telling Mother that, if she accepted representation by appointed counsel, the court would appoint someone other than Trambley to represent her. The court then stated, "[M]ost people would say, it is a fool's game for a Mother who portends to love their children so much to try to come in here and represent yourself. Will you accept the appointment of another attorney?" Mother responded in the affirmative, and the circuit court appointed Addam Holder to represent her.

¶ 101   As for her evidence of the circuit court "pressuring" her to forgo her right to represent herself and accept appointed counsel, Mother cites to one instance in the report of proceedings, at a status hearing on July 29, 2025. The court began the hearing by noting which parties were present in court that day. In doing so, the court stated that when this matter was last before the court, Mother appeared without an attorney, and that she was again present without an attorney.

31

¶ 102   It is clear that, despite Mother's arguments on appeal, the circuit court neither referred to her as a fool nor pressured her to accept any appointed counsel, much less an attorney who could not provide effective representation. There is no rational reading of the circuit court's remarks that would lead to the conclusion that the court showed bias against Mother specifically or *pro se* litigants in general. The court was clear in expressing that it was not referring to Mother as a fool, and the word only came up in idioms and expressions, and the court expressly stated that it was not calling Mother a fool or otherwise disrespecting her. Likewise, Mother cites to no evidence in the report of proceedings of the circuit court compromising her right to represent herself in any way. The circuit court merely cautioned her about the difficulties of proceeding *pro se* without any legal expertise. Thus, we reject Mother's argument that the circuit court was biased or prejudiced against her.

¶ 103                                    III. CONCLUSION

¶ 104   For the reasons stated, the circuit court did not err in terminating Mother's parental rights. The judgment of the circuit court is affirmed.

¶ 105   Affirmed.