NOTICE
Decision filed 04/15/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 251008-U

NOS. 5-25-1008, 5-25-1009, 5-25-1010,

5-25-1011 cons.

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| *In re* OLIVER O., PAISLEY O., PARKER O., and ANDY O., Minors | Appeal from the Circuit Court of Franklin County. |
| (The People of the State of Illinois, | |
| Petitioner-Appellee, | |
| v. | Nos. 23-JA-32, 23-JA-33, 23-JA-34, 23-JA-35 |
| Ashley O., | Honorable Melissa A. Morgan, |
| Respondent-Appellant). | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice Cates and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court erred in finding the respondent mother to be an unfit parent on the bases of a failure to protect the minors from conditions in their environment injurious to their welfare and a failure to make reasonable progress toward the return of the minors. The circuit court's order terminating the respondent's parental rights is vacated and the matter is remanded for a new fitness hearing.

¶ 2    Respondent, Ashley O. (Mother), appeals from the Franklin County circuit court's order terminating her parental rights over her four minor children. In response, the State concedes two of her three arguments on appeal and asserts that we need not address Mother's third argument, as

1

the first two issues are dispositive and require remand. We accept the State's concessions and remand this matter to the circuit court for further proceedings.

¶ 3                                      I. BACKGROUND

¶ 4     On September 27, 2023, the State filed a petition for adjudication of wardship and a motion for temporary custody regarding Mother's four minor children. The State alleged that the minors were neglected due to an injurious environment because Mother actively used methamphetamine in the home, and there was a history of domestic violence in the home between Mother and her then-husband (Father)[1] while they were serving as the minors' primary caregivers. The circuit court held a shelter care hearing on the same date.

¶ 5     At the shelter care hearing, the Illinois Department of Children and Family Services (DCFS) investigator Amanda Yosanovich testified about how the minors came to be in protective custody. Yosanovich responded to a DCFS hotline call regarding Mother's erratic behavior. Mother admitted to Yosanovich that she had been using methamphetamine daily for approximately the last six months. She also told Yosanovich that she and Father had domestic altercations, including an incident where he threw her down the stairs. The minors were not attending school or taking their medications. Father had been arrested for domestic violence stemming from an incident on September 8, 2023. On September 27, 2023, Mother submitted to drug testing, and the result came back positive for methamphetamine

¶ 6     The circuit court entered an order granting DCFS temporary custody over the minors on September 27, 2023. At the October 30, 2023, adjudicatory hearing, counsel for Mother and Father stipulated to the allegations in the State's petition and the testimony presented at the shelter care

---

[1]This individual is not the biological father of all of the minors. We refer to him as "Father" only for simplicity. While he was also subject to termination proceedings, he is not a party to this appeal, and we therefore mention him only where relevant to Mother's case.

hearing. The court entered an agreed adjudicatory order on the same date, finding that the minors were neglected due to an environment injurious to their welfare. 705 ILCS 405/2-3(1)(b) (West 2022).

¶ 7    DCFS approved an initial service plan for Mother on November 13, 2023. Her services included completing an integrated assessment, cooperating with caseworkers, mental health, parenting, and substance abuse assessments. Mother's substance abuse requirement included an initial assessment, counseling, drug testing, and refraining from associating with people with substance abuse or legal issues.

¶ 8    The circuit court held a dispositional hearing on December 11, 2023. DCFS caseworker Morgan White testified that Mother had been directed to engage in substance abuse, parenting, mental health, and domestic violence services; establish safe housing; and cooperate with the agency. She had engaged in each of those services and tested negative on all drug tests apart from one that was positive for THC. DCFS had also deemed her home appropriate for visitation with the minors. Mother was participating in supervised visits with her children and had divorced Father.

¶ 9    The State filed a petition to terminate Mother's parental rights on March 28, 2025. It alleged that Mother was an unfit parent due to (1) a failure to protect the minors from conditions in their environment injurious to their welfare and (2) failure to make reasonable progress toward the return of the minors in the nine-month period following the adjudication of neglect from June 27, 2024, to March 27, 2025. 750 ILCS 50/1(D)(g), (m)(ii) (West 2024).

¶ 10    The circuit court held a fitness hearing on September 22, 2025. DCFS caseworker Amy Slone testified that she had been the caseworker for the family since the case was opened. Mother had been recommended to complete substance abuse, mental health, parenting, domestic violence,

3

non-offender sexual abuse, housing, and employment services. She stated that Mother had moved out of town with a boyfriend in July 2025, but returned to the area in September 2025. She resumed her previous relationship with the putative father[2] of one of the minors, and married him a week before the fitness hearing. At that time, she moved out of her apartment and moved into his residence.

¶ 11    Slone further testified that Mother had completed substance abuse counseling and was in a peer recovery group. However, the provider for the latter did not recommend closing her case because she failed to take accountability for her actions. At the time of the hearing, Mother was not close to completing this program. Furthermore, Mother would repeatedly ask for a different peer specialist whenever she disagreed with the one assigned to her. Slone opined that Mother took accountability only in the sense that she knew she did something wrong, but she struggled to change her actions going forward.

¶ 12    Mother had begun mental health counseling but stopped attending prior to completion. Mother was prescribed several medications, and Slone was concerned about Mother's medication use. This was based on her observations of Mother appearing drowsy, slow-talking, and having "heavy eyes." In August 2025, Slone asked Mother to provide her with her medications so that Slone could ensure Mother was taking them properly. Mother did so, and Slone noted that two medications were missing. Mother said she left them at her boyfriend's house.

¶ 13    Mother did not attend a psychological evaluation scheduled for July 31, 2025. Mother completed domestic violence counseling, non-offender sexual abuse counseling, and parenting

---

[2]Mother's relationship with this individual had been established at prior permanency hearings. He was a registered sex offender, and Mother's relationship with him was the reason for DCFS adding a non-offender sexual abuse course to her service plan. Mother's belief that he was an appropriate caregiver for her children, as well as her lack of honesty with DCFS and treatment providers regarding her relationship, led the circuit court to enter a permanency order finding that she had failed to make reasonable efforts or progress on October 28, 2024.

4

classes, but did not successfully finish a parenting program that involved home observation, because it was stopped when the court changed the permanency goal to substitute care.

¶ 14 Slone had not visited Mother's current residence, which was the home of her new husband, a registered sex offender, because Mother had moved there very recently. However, Slone opined that she would not describe Mother's living situation as safe, due to the husband's presence. Slone said that while Mother understood the appropriate safety plan that came with living with a registered sex offender, there had been no opportunity for Slone to observe Mother's implementation of said plan, because her husband had been living in a hotel until recently. Slone further testified that Mother had shown proof of employment and income. She had not completed all of her drug tests, but the ones she did complete always tested positive for THC and amphetamines, although the latter was due to her prescribed medication. Slone said that Mother's attendance at drug testing declined in the spring of 2025, after which point she missed an estimated 50% of her test appointments.

¶ 15 Slone testified that Mother's visitation with the minors was "chaotic," and she was concerned about Mother's ability to parent four very active children, including one who was sometimes physically aggressive and tried to "elope" from visits. Slone did not believe Mother was capable of monitoring all four minors at once, and she often looked to the visitation supervisor to step in and regain control. Slone further opined that Mother did not grasp "a lot of things" and did not understand the magnitude of her children's behavioral issues, including that they displayed sexualized behavior.

¶ 16 Mother also did not seem concerned about having her children around her new husband, despite his documented criminal history as a sex offender. Mother's husband had not completed an integrated assessment, but he did complete a psychosexual evaluation. The evaluation report

5

indicated that he had previously been rated as a moderate risk around children, but was now considered to be a below-average risk, due to the length of time he had spent in the community with no new offenses. The report also recommended that he complete mental health services, which, to Slone's knowledge, he had not done.

¶ 17    Slone was also concerned about Mother's ability to recognize what was safe and appropriate for her children stemming from Mother's previous boyfriend, with whom she had been living prior to returning to her now-husband. Mother told Slone that the children would be safe around the boyfriend, and she tried to have him approved for visitation. However, she never provided Slone with the information needed to conduct a background check. Additionally, after she left him, Mother told Slone that he was *not* safe and appropriate for her children. Slone opined that Mother had not sufficiently changed her circumstances to allow for the minors' return to her care. Although Slone believed that Mother loved her children, Slone testified that she prioritized other things, such as her relationships, over the children's safety.

¶ 18    Next, Charis Clinical Services employee Jon Adkins testified that he performed a parenting capacity assessment on Mother in March 2025. This involved reviewing DCFS documents and meeting with Mother, first alone and then with her children, for approximately five hours in total. At their first appointment, he stated that Mother fell asleep and he had to wake her up. She struggled to remain awake during the three hours they met that day. Because of this behavior, Adkins testified that he was concerned about Mother's ability to care for the minors, regardless of the cause of her drowsiness.

¶ 19    From observing her interactions with three of the minors, Adkins stated that it was clear that she loved them, she was actively engaging in play with them, and she displayed healthy physical touch and verbal interactions. However, Adkins described the last half of this two-hour

meeting as "pretty out of control." One of the minors tried to leave the room seven times, and Mother sometimes did not notice until it was pointed out to her. Adkins stated that he had to station himself in front of the door to stop the minors from "eloping." Mother appeared increasingly overwhelmed as the session went on. At the time of writing his report in March 2025, Adkins did not believe that Mother was capable of managing all three children. He also did not believe that the children respected Mother as an authority figure.

¶ 20 Adkins was aware that the fourth child, who was not present during the assessment, had complex behavioral issues, and Adkins stated that this would present an additional challenge for Mother. Adkins opined that Mother did not have a firm grasp on the risks of harm to her children that were present while she was supervising them. At the time of his report, he did not believe that Mother had the capacity to parent the minors, nor would it be safe for the minors to be in her care. He stated that if nothing had changed between the assessment and the fitness hearing, then his opinion would be the same at present. The State rested its case.

¶ 21 Mother testified that the minors' behavioral issues were affected by their time in foster care. She believed that she had things under control and stated that she had a support system to help her with the children, which included her grandparent and husband. She said that she was aware of her new husband's criminal history and of DCFS's concerns, but he had never exhibited concerning behavior around her or her children. Mother added that if he did, she would remove herself and the minors from the situation. She testified that she loved her children more than any of her relationships, and if someone presented a danger to her children, she would prioritize their safety.

¶ 22 Mother also asserted that she had completed almost everything DCFS asked of her. She attributed missing her psychological evaluation to her running out of gas to get to the location, and

7

also learning that she was pregnant. She added that she thought the evaluation had been rescheduled, but she was not sure of the date. Mother also denied abusing any of her medications. She did not feel that they caused her to be unsafe around her children or affected her ability to parent them. She added that if any medications were to have such effects, she would cease taking them.

¶ 23    Mother testified that she missed her children and that being without them since 2023 had taken a toll on her mental health, which led to her making decisions she now regretted. These decisions included moving out of town with her previous boyfriend. However, Mother believed that marrying her current husband was a wise decision, as he provided stability and consistency in her life. However, if any evaluation recommended that he should not be left alone with her children, she felt prepared to ensure this.

¶ 24    The circuit court took the matter under advisement and issued a written ruling on October 27, 2025. The court found by clear and convincing evidence that Mother was unfit to parent based on (1) a failure to protect the minors from conditions in their environment injurious to their welfare; and (2) failure to make reasonable progress toward the return of the minors during the nine-month period from March 5, 2024, to December 5, 2024. In support of its findings, the circuit court noted that Mother had missed approximately 50% of her random drug tests and, while she completed parenting classes, she had not undergone an assessment of her ability to apply parenting skills to real-life situations in the home.

¶ 25    The circuit court further stated that Mother stopped attending mental health services, and in July 2025, she moved out of town to live with a boyfriend she had just met, and whose full name she did not know. She then moved back to live with and marry her current husband in September 2025. The circuit court noted that this individual was a registered sex offender, a fact of which

8

Mother was aware when she chose to pursue the relationship. Mother had also been inconsistent with visitation, missing visits in July, August, and September 2025.

¶ 26　The best-interest hearing took place on December 8, 2025. After hearing testimony and arguments, the circuit court found that it was in the minors' best interests that Mother's parental rights be terminated[3] and that three of the four minors be adopted. The fourth minor was currently in a residential facility, where he received therapy for his behavioral issues and other needs. The court found that it was in this minor's best interest to remain at this facility. This appeal followed.

¶ 27　　　　　　　　　　　　　　II. ANALYSIS

¶ 28　On appeal, Mother argues that the circuit court erred as a matter of law by finding her unfit to parent based on (1) a failure to protect the minors from their injurious environment, where the court based its finding on conduct that occurred after the minors were taken from her care; and (2) a failure to make reasonable progress toward the return of the minors during the nine-month period from March 5, 2024, to December 5, 2024, when the allegations in the State's petition listed a nine-month period of June 27, 2024, to March 27, 2025. Mother also argues in the alternative that the State did not prove by clear and convincing evidence that Mother was unfit due to either aforementioned basis.

¶ 29　In response, the State concedes that the circuit court erred in finding Mother unfit on both bases. The State asks that we remand the matter for further termination proceedings, and adds that we need not address Mother's argument in the alternative, as the State's concession to Mother's other two points is dispositive. For the following reasons, we agree.

¶ 30　As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

---

[3]Father's parental rights to each minor were also terminated in these proceedings.

9

"D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:

* * *

(g) Failure to protect the child from conditions within his environment injurious to the child's welfare.

* * *

(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(g), (D)(m)(ii) (West 2024).

¶ 31 Regarding subsection 1(D)(g) of the Adoption Act, our supreme court has held that a parent cannot be found unfit based on a failure to protect the child during any time in which the child was removed from the injurious home environment and living in foster care. *In re C.W.*, 199 Ill. 2d 198, 212 (2002). Furthermore, the clear and unambiguous statutory language does not permit a finding under this subsection to be based on evidence that the parent failed to correct or improve the conditions in her environment following the removal of the minor. *Id.* at 212-13 ("It follows, therefore, that where a child has been removed from an injurious home environment and placed in foster care, a parent cannot be found unfit based on a 'failure to protect' during the period the child is in foster care."). However, a parent may be found unfit pursuant to this subsection based on evidence of her conduct that gave rise to the adjudication of neglect. *Id.* at 218-19.

¶ 32 Here, the adjudication of neglect was based on an injurious environment caused by Mother's methamphetamine use and the presence of domestic violence between Mother and Father. The minors were placed in the care of DCFS on September 27, 2023. The record on appeal shows that the State did not present evidence at the fitness hearing of Mother's failure to protect the minors from these factors in the home environment prior to the minors' removal. Additionally, the evidence presented indicated that, while Mother did not attend all of her random drug tests, she never tested positive for methamphetamine, nor any other substance apart from THC or

medications that she had been prescribed. She had also divorced Father and completed domestic violence counseling and non-offender sexual abuse counseling. While there were concerns about her current husband, there was no evidence presented that she was involved in domestic violence after the minors were placed in care.

¶ 33     Under subsection 1(D)(m)(ii) of the Adoption Act, reasonable progress is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The measure of a parent's reasonable progress includes her compliance with her service plan and the court's directives "in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)).

¶ 34     Our supreme court has explained that the legislature's inclusion of specific time period requirements in section 1(D) of the Adoption Act was significant, stating:

> " 'The varying presence and absence of time periods in the provisions under section 1(D) demonstrates to us that the legislature believed that, for purposes of establishing certain allegations of unfitness, a parent's conduct during a specified period of time would be relevant.' " *In re D.C.*, 209 Ill. 2d 287, 301 (2004) (quoting *In re D.L.*, 191 Ill. 2d 1, 11 (2000)).

Furthermore, the supreme court stated that the trial court is "required to find clear and convincing evidence of a lack of reasonable progress during the applicable time period." *Id.* at 301-02. Subsection 1(D)(m) of the Adoption Act requires the termination petition to include the specific nine-month period alleged, stating that "when a petition or motion seeks to terminate parental rights on the basis of subparagraph (ii) of this paragraph (m), the petitioner shall file with the court

and serve on the parties a pleading that specifies the 9-month period or periods relied on." 750 ILCS 50/1(D)(m) (West 2024).

¶ 35    The State alleged in its petition for termination of parental rights that Mother failed to make reasonable progress during the nine-month period from June 27, 2024, to March 27, 2025. However, the circuit court found that Mother failed to make reasonable progress during the period from March 5, 2024, to December 5, 2024, a finding that was not based on the State's allegations. As the State notes on appeal, Mother did not receive notice of the approximately three-month period that the circuit court considered that preceded the State's specified period. Additionally, the circuit court did not indicate in its findings that Mother failed to make reasonable progress from December 6, 2024, to March 27, 2025, which *was* included in the State's allegations. The State also notes that on May 20, 2024, which fell within the circuit court's nine-month period, the court entered a permanency order finding that Mother had made reasonable efforts and satisfactory progress toward the return of her children.

¶ 36    Lastly, both Mother and the State argue that, if the circuit court's indication of a different nine-month period than the one alleged by the State was due to a scrivener's error, this court recently rejected a similar argument in our unpublished summary order in *In re Evangelina C. & Amaryllis A.*, Nos. 5-24-1043, 5-24-1044 cons. (2025) (unpublished summary order under Illinois Supreme Court Rule 23(c)). In that case, the circuit court found that the respondent parent failed to make reasonable progress during a different nine-month period than the one alleged by the State, a period that began before the minor in question was even born. *Id.* ¶ 25.

¶ 37    We noted that a parent's right to raise their child is a fundamental liberty interest, and the involuntary termination of that right is a drastic measure. Therefore, we stated that "[w]hether a scrivener's error or not, the termination of respondent's fundamental right to parent is not taken

12

lightly. Great care must be taken by the State, DCFS, and the circuit court, to ensure that the matter is properly considered." *Id.* ¶ 26. We found the circuit court's termination of the respondent's parental rights based on a nine-month period not alleged by the State to have been in error, and, for this and other reasons, we reversed the circuit court's decision. *Id.* ¶¶ 26-28. In the present matter, we follow the same reasoning, and reach the same conclusion.

¶ 38                                    III. CONCLUSION

¶ 39    For the reasons stated, we vacate the judgment of the circuit court terminating Mother's parental rights over the four minors, and remand the case for a new fitness hearing and any further termination proceedings that may be necessary.


¶ 40    Order vacated; cause remanded with directions.